

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-17-2000

# Hameen v. Delaware

Precedential or Non-Precedential:

Docket 96-9007

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Hameen v. Delaware" (2000). *2000 Decisions.* Paper 98.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/98

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 17, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-9007

ABDULLAH TANZIL HAMEEN, a/k/a
CORNELIUS FERGUSON

v.

STATE OF DELAWARE

CORNELIUS E. FERGUSON, JR.,
a/k/a Abdullah Tanzil Hameen,

      Appellant

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. No. 96-00306)
District Judge: Honorable Joseph J. Lonogobardi

Argued January 28, 1998

BEFORE: MANSMANN, GREENBERG, and MCKEE,
Circuit Judges.

Reargued February 22, 2000

BEFORE: GREENBERG, MCKEE, and RENDELL,
Circuit Judges.

(Filed: May 17, 2000)

John S. Malik (argued)
100 E. 14th Street
Wilmington, DE 19801

Joseph R. Slights, III
Kent A. Jordan (argued)
Morris, James, Hitchens & Williams
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899

 Attorneys for Appellant

Loren C. Meyers (argued)
Chief of Appeals Division
Timothy J. Donovan, Jr.
William E. Molchen
Thomas E. Brown
Deputy Attorneys General
Department of Justice
820 North French Street
Wilmington, DE 19801

 Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. BACKGROUND

This matter comes before the court on an appeal by
Cornelius Ferguson, a/k/a Abdullah Tanzil Hameen, from
the denial of relief in this habeas corpus case. We have
considered each of Ferguson's contentions, and for the
reasons that follow, we will affirm the district court's order.

In 1992, a Delaware state jury convicted Ferguson of two
counts of first-degree murder as well as other charges
resulting from a single homicide and robbery. After a
penalty hearing, the jury unanimously found that the state
established three aggravating circumstances beyond a
reasonable doubt: (1) Ferguson previously had been

2

convicted of another murder or manslaughter or of a felony involving the use of, or threat of, force or violence upon another person, Del. Code Ann. tit. 11, S 4209(e)(i) (1995); (2) Ferguson committed the murder while engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of robbery, id. S 4209(e)(j); and (3) Ferguson committed the murder for pecuniary gain, id. S 4209(e)(o). The jury also unanimously found, by a preponderance of the evidence, that the aggravating circumstances outweighed the mitigating circumstances.

The trial court then independently analyzed the evidence and reached the same conclusions, though it considered the robbery and pecuniary gain aggravators as one factor, and placed no independent weight on the pecuniary gain aggravator. App. at 138. In particular, the court concluded "that the mitigating factors proven by [Ferguson] have been proven by a preponderance of the evidence to be far outweighed by the callous nature of this crime, the fact that the murder took place during the attempted commission of a robbery, the fact that [Ferguson] had previously been convicted of a murder and an aggravated assault with a firearm, the fact that [Ferguson] has demonstrated a propensity for extremely violent activity every time he has been released from prison, and [Ferguson's] almost cavalier attitude toward the victim's death." Id. at 141. In accordance with Delaware law at the time of sentencing, the court imposed a death sentence for the first-degree murder convictions because it determined that the aggravating circumstances outweighed the mitigating circumstances. The Delaware Supreme Court affirmed the convictions and sentences on direct appeal. See Ferguson v. State, 642 A.2d 772 (Del. 1994) (en banc).

Thereafter, Ferguson filed an unsuccessful petition for post-conviction relief in the Delaware Superior Court, see State v. Ferguson, 1995 WL 413269 (Del. Super. Ct. Apr. 7, 1995), and on appeal, the Delaware Supreme Court affirmed its denial. See Ferguson v. State, 676 A.2d 902 (Del. 1995) (table). He then filed his unsuccessful habeas corpus petition in the district court, leading to this appeal. See Ferguson v. State, 1996 WL 1056727 (D. Del. Dec. 13,

1996). We are concerned on this appeal only with sentencing issues.

The Supreme Court of Delaware set forth the facts of the case as follows:

> The record reflects that Ferguson shot and killed Troy Hodges (`Hodges'). The homicide took place on the night of August 5, 1991, in the parking lot of the Tri-State Mall (the `Mall') in Claymont, Delaware. Ferguson was accompanied by Tyrone Hyland (`Hyland').
>
> Both Ferguson and Hyland lived in Chester, Pennsylvania. Hodges, who was apparently a drug dealer living in Wilmington, had negotiated to purchase a half-kilogram of cocaine for $10,000 either directly from Hyland or from a third party, with Hyland acting as middleman. Hodges arranged to meet Hyland at the Mall.
>
> Hodges had a friend, Alvin Wiggins (`Wiggins'), accompany him to the Mall. Wiggins was seventeen years old at the time of these events. Wiggins was also apparently a drug dealer. Wiggins testified at Ferguson's trial.
>
> According to Wiggins, before they drove to the Mall, Hodges gave Wiggins a plastic bag holding two smaller packages, each of which contained $5,000 in cash. They then drove to the Mall and parked in the lower lot. Wiggins testified that after they arrived at the Mall, Hodges took one of the two packages of money and instructed him to stay in his car until he received a sign from Hodges or until he returned.
>
> Hodges then left and entered a passageway leading to the upper parking lot of the Mall. Hodges was no longer visible to Wiggins. Wiggins waited for Hodges for approximately ninety minutes. During that time, he unsuccessfully attempted to contact Hodges via his `beeper.' When Wiggins learned that someone had been shot at the Mall, he drove away.
>
> Ferguson gave a tape recorded statement to the Delaware State Police on September 26, 1991. It was admitted into evidence at trial during the State's case-

4

in-chief. In his statement, Ferguson admitted that he was a passenger in a car driven by Hyland to the Mall on the night of August 5, 1991. Ferguson stated that he was sitting in the back seat of the car.

According to Ferguson, when they arrived at the Mall, Hyland parked the car. Hodges got into the front passenger seat of the car. Hyland and Hodges then argued about money and drugs. According to Ferguson, Hyland then clandestinely gave him a gun. Ferguson stated that the gun was already cocked when he received it. Ferguson pointed the gun at Hodges.

Hyland and Hodges continued to argue. Ferguson stated that although the car was moving slowly towards the Mall, Hodges opened the car door and tried to leave the car. According to Ferguson, Hodges then slapped at the gun, causing it to `accidentally'fire a single shot. Ferguson claimed that he did not know Hodges had been wounded and died, until days later.

Stewart Cohen (`Cohen') testified that on the night of August 5, 1991, he was in the parking lot of the K-Mart at the Tri-State Mall. Cohen stated that he heard a `popping sound.' Cohen turned and saw a blue Chevrolet Cavalier moving slowly in the parking lot. Cohen stated that he saw a person shoved or jumping out of the car. Cohen testified that this person then ran towards him and collapsed on the sidewalk.

An autopsy revealed that Hodges died of massive hemorrhaging due to a single gunshot wound. The record reflects that the bullet, which was fired from behind, entered his left side and travelled through his body in an upward trajectory. The hole in Hodges' shirt and the wound in his torso indicated that the muzzle of the gun had been pressed against Hodges' body when the shot was fired.

Ferguson v. State, 642 A.2d at 775-76 (footnotes omitted). The Supreme Court of Delaware also noted that the gun used in the shooting belonged to Ferguson. Id. at 776 n.4.

The critical issue on this appeal is attributable to the trial court's having sentenced Ferguson under Delaware's

5

capital sentencing statute as amended effective November 4, 1991, even though Ferguson murdered Hodges on August 5, 1991. The court employed the amended law as by its terms it applies "to all defendants tried or sentenced after its effective date." 68 Del. Laws ch.189,S 6 (1991). Ferguson contends that inasmuch as the Delaware legislature enacted the amendments after he murdered Hodges, use of the amended law violated the Ex Post Facto Clause of the United States Constitution.

Obviously, it is important in resolving the ex post facto issue that we carefully consider the provisions of the capital provisions both at the time of the offense and the time of the sentencing, for if the amended law did not make significant changes in the sentencing process, there hardly could be an ex post facto problem. At the time that Ferguson committed his offenses, in a Delaware capital case the jury determined the sentence, and it could impose a death sentence only if it unanimously found at least one statutory aggravating circumstance beyond a reasonable doubt, and concluded, after weighing the aggravating and mitigating circumstances, that it should impose a death sentence. Nevertheless, the statute did not require the jury to impose a death sentence if the aggravating factors outweighed the mitigating factors. In addition, although the court instructed the jury as to the types of things that it could take into account in making its decision, the statute placed no limitations on what the jury could consider.

The amended law changed the foregoing procedure, and the Delaware Supreme Court describes its capital sentencing provision as follows:

> Under Delaware law, as revised in 1991, a sentence of death may be imposed only under the bifurcated procedure prescribed by 11 Del. C. S 4209. That statute requires the jury to determine, during the penalty phase, (1) whether the evidence shows beyond a reasonable doubt the existence of at least one statutory aggravating circumstance and (2) whether, by a preponderance of the evidence, the aggravating circumstances outweigh any mitigating circumstances found to exist. 11 Del. C. S 4209(c). The trial court, after considering the recommendation of the jury, is to

6

decide the same questions. If the court concludes that the answer to both questions is in the affirmative, it must impose a sentence of death; otherwise, it must impose a sentence of life imprisonment without the possibility of probation, parole, or other reduction in sentence. 11 Del. C. S 4209(d). Thus, the Superior Court bears the ultimate responsibility for imposition of the death sentence while the jury acts in an advisory capacity `as the conscience of the community.' State v. Cohen, Del. Supr., 604 A.2d 846, 856 (1992).

Wright v. State, 633 A.2d 329, 335 (Del. 1993).

The trial court in its "Findings After Penalty Hearing" at the trial summarized the essential differences between the law in effect on the date of Ferguson's offenses and the amended law it applied at his sentencing:

[U]nlike a jury under the old law, this Court, under the new law, may consider only whether or not aggravating factors outweigh mitigating factors. The Court may not in unfettered discretion refuse to impose a sentence of death where aggravating factors are proven and found to be of substantial weight and mitigating factors are found to be of less weight. The Court may not consider, in reaching its decision, mercy, societal concerns, proportionality of the sentence to other sentences imposed for Murder First Degree in other cases, or any other issues not specifically pertaining to `the particular circumstances or details of the offense[or] . . . the character and propensities of the offender. . . .' These factors most likely were considered by and may have influenced the jury or individual jury members in their decision under the prior statute to recommend or fail to recommend death. Under that law, the jury clearly acted as `the conscience of the community' and could in its unfettered discretion recommend life as the appropriate punishment for the crime and offender even though it had found the aggravating factors to outweigh the mitigating factors.

App. at 129-30 (emphasis in original, footnote omitted).

Ferguson argued in state court that application of the amended sentencing statute in his case violated the Ex Post

7

Facto Clause because it eliminated the jury's unfettered discretion to impose a life sentence even though it may have determined that aggravating circumstances outweighed mitigating circumstances, and instead required the court to impose a death sentence if it made that same finding. The Delaware Supreme Court rejected Ferguson's ex post facto claim as "without merit," citing the following reasons for its decision:

> This Court has previously held that `the changes effected by Delaware's new death penalty statute are procedural,' because the 1991 amendments `merely alter[ed] the method of determining imposition of the death penalty. The quantum of punishment for the crime of first-degree murder in Delaware remains unchanged.' State v. Cohen, Del. Supr., 604 A.2d 846, 853 (1992). See Dobbert v. Florida, 432 U.S. 282, 293-94, 97 S.Ct. 2290, 2298-99, 53 L.Ed.2d 344 (1977). The restrictive nature of the advisory jury's findings and the mandatory imposition of the death penalty by the sentencing judge under the amended statute are likewise `procedural,' and therefore do not implicate ex post facto concerns. See State v. Cohen, 604 A.2d at 849, 853-54.

> Ferguson `has cited no legal precedent or intervening changes in the law that would undermine the ratio decidendi of this Court's holding in Cohen on the ex post facto issue.' Dawson v. State, Del.Supr., 637 A.2d 57, 61 (1994). Accordingly, we decline to overrule Cohen. We adhere to our ex post facto holding in that decision and its progeny. Accord Gattis v. State , Del. Supr., 637 A.2d 808, 821 (1994); Wright v. State , Del. Supr., 633 A.2d 329, 343 (1993); Red Dog v. State, Del. Supr., 616 A.2d 298, 305-06 (1992).

Ferguson v. State, 642 A.2d at 783. In Dawson, Gattis, Wright and Red Dog, the Delaware Supreme Court similarly adhered to, and did not expand upon, its analysis in State v. Cohen, 604 A.2d 846 (Del. 1992).

In view of the Delaware court's reliance in Cohen on Ferguson's appeal, we now describe its ruling in Cohen, though we will return to it later in this opinion after we

8

consider the germane United States Supreme Court opinions. In Cohen, the Delaware court largely relied on Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290 (1977), which it cited for the proposition that, " `[e]ven though it may work to the disadvantage of a defendant, a procedural change [in the law] is not ex post facto.' " 604 A.2d at 853 (quoting Dobbert, 432 U.S. at 293, 97 S.Ct. at 2298) (second alteration in original). Dobbert was concerned with a change in the sentencing process which, as is the case in the amended Delaware sentencing law at issue here, modified the functions of the court and jury. The Delaware Supreme Court found that Dobbert was " `[t]he case most analogous to the issue here. . . ." Id. It observed that the death penalty statute under challenge in Dobbert " `simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime.' . . . That is precisely the issue before us." 604 A.2d at 853 (citation omitted). It concluded that,

> [g]iven the teaching in Dobbert, it is clear that the changes effected by Delaware's new death penalty statute are procedural. The revisions in the new law, like those in Dobbert, merely alter the method of determining imposition of the death penalty. The quantum of punishment for the crime of first-degree murder in Delaware remains unchanged.

Id.

The Delaware Supreme Court also held in Cohen that its "conclusions regarding the defendants' ex post facto claims are buttressed by the recent case of Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990)." Id. at 854. It noted that Collins overruled the ex post facto analysis in Kring v. Missouri, 107 U.S. 221, 2 S.Ct. 443 (1883), and Thompson v. Utah, 170 U.S. 343, 18 S.Ct. 620 (1898), leading the Delaware court to infer that,"by rejecting Kring and Thompson, it is now beyond peradventure that under Collins the new law survives an ex post facto analysis." Id. at 854. The Delaware court explained that "it is apparent that the new law does not involve `a right that has anything to do with the definition of crimes, defenses, or punishments, which is the concern

9

of the Ex Post Facto Clause.' " Id. (quoting Collins, 497 U.S. at 51, 110 S. Ct. at 2724).

In Cohen the Delaware court concluded that "procedural statutes which merely act to the disadvantage of those affected by their enactment are not prohibited as ex post facto laws." Id. The Delaware court rejected the defendants' reliance in Cohen on Miller v. Florida , 482 U.S. 423, 107 S.Ct. 2446 (1987), a case involving retroactive changes in sentencing guidelines, as it distinguished Miller on the ground that in Miller "the retroactive application of revised sentencing guidelines . . . increased the quantum of a defendant's punishment–– an effect manifestly prohibited by the Ex Post Facto Clause." Cohen, 604 A.2d at 854 (citing Miller, 482 U.S. at 433–34, 107 S.Ct. at 2453). The Delaware Supreme Court believed that the changes brought by the new sentencing process did not make a comparable increase in the quantum of sentence.

Finally, the court in Cohen rejected the defendants' reliance on Lindsey v. Washington, 301 U.S. 397, 57 S.Ct. 797 (1937), and State v. Dickerson, 298 A.2d 761, 768–69 (Del. 1973). Lindsey invalidated the use on ex post facto grounds of a new law that required the imposition of a sentence which under earlier law had not been mandatory. Dickerson relied on Lindsey to hold that a newly adopted mandatory death penalty provision in the Delaware murder statute could not be applied retroactively. See Cohen, 604 A.2d at 855. The defendants in Cohen argued that the November 4, 1991 changes in the Delaware law were substantive and not merely procedural because "the new law . . . makes mandatory a sentence, which under the prior law, was discretionary, and . . . eliminates the unanimous jury requirement thus making a death sentence more likely." Id. at 855.

The Delaware court rejected that argument as "predicated upon a flawed interpretation of what is meant by a mandatory sentence." Id. The court observed that, under Lindsey and Dickerson, the retroactive application of a statute to make mandatory what was only the maximum sentence at the time of the offense violated the Ex Post Facto Clause. But the court ruled that Delaware's amended law "is not `mandatory' [in the Lindsey  sense because]

10

imposition of the death penalty is based upon the predicate factual findings made by the jury and trial judge as to aggravating and mitigating circumstances. The existence of such factors and their relative weight, although ultimately determined by the trial judge, do not mandate a death sentence unless the aggravating factors outweigh the mitigating circumstances. Thus, the new law is not `impermissibly mandatory.' " Id. The court cited Walton v. Arizona, 497 U.S. 639, 651-52, 110 S. Ct. 3047, 3056 (1990); Blystone v. Pennsylvania, 494 U.S. 299, 306-07, 110 S.Ct. 1078, 1083 (1990); Boyde v. California , 494 U.S. 370, 374, 110 S.Ct. 1190, 1194-95 (1990); and Proffitt v. Florida, 428 U.S. 242, 260-61, 96 S.Ct. 2960, 2970 (1976), in support of this conclusion. The court concluded that, "[b]y ignoring the weighing process, a crucial and constitutionally required step under the new law, the [defendants] demonstrate[ ] the weakness of [their] argument. The sentencing process remains basically discretionary, merely shifting the ultimate decision from the jury to the trial judge." Id.

On June 13, 1996, after his unsuccessful post-conviction relief proceedings in the state courts, Fergusonfiled his habeas petition pursuant to 28 U.S.C. S 2254 in the district court. The district court granted a stay and appointed counsel. On December 13, 1996, the district court, without holding an evidentiary hearing but after entertaining oral argument, denied the petition in a comprehensive opinion and declined to issue a certificate of appealability. See Ferguson v. State, 1996 WL 1056727, at *28.

Ferguson then appealed. We granted a certificate of appealability and, pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214, 28 U.S.C. S 2253(c)(3), directed the parties to address the following issues:

>    (1) What deference, if any, must this Court gi ve to the Delaware court's conclusions and applications of law? See 28 U.S.C. S 2254(e);

>    (2) Whether application of Delaware's amended death penalty statute is a violation of the Ex Post Facto Clause?; and

11

(3)(a) Whether the aggravating factors of pecu niary gain and robbery are duplicative and violative of the Eighth Amendment?; and

(b) Whether the state court's review of this c laim for plain error indicates that it is not an independent and adequate state ground barring federal review?

Insofar as we review the opinion of the district court we exercise plenary review on this appeal. See Hartey v. Vaughn, 186 F.3d 367, 371 (3d Cir. 1999). We have jurisdiction under 28 U.S.C. S 1291.

## II. DISCUSSION

### A. Application of the Antiterrorism and Effective Death Penalty Act

As we have indicated, our certificate of appealability included a question of the scope of the AEDPA which is applicable in this action as Ferguson initiated the habeas proceeding after the effective date of the AEDPA. See Hartey v. Vaughn, 186 F.3d at 371. Subsequently, after we issued the certificate of appealability, we addressed this issue in Matteo v. Superintendent, 171 F.3d 877, 880 (3d Cir. 1999) (en banc). Since then, however, the Supreme Court has decided the same issue in Williams v. Taylor, 68 U.S.L.W. 4263 (U.S. Apr. 18, 2000). Accordingly, we will apply that case without making our own determination on the issue regarding the effect of the AEDPA.

Williams v. Taylor construed the AEDPA, 28 U.S.C. S 2254(d)(1), which, as germane here in a case concerning a person in custody pursuant to the judgment of a State court, provides that "with respect to any claim that was adjudicated on the merits in State court proceedings" an application for a writ of habeas corpus shall not be granted unless the adjudication of the claim "resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The Court in Williams v. Taylor held that"[u]nder the `contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to

12

that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 4277. Williams v. Taylor further held that "[u]nder the `unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id . at 4276. Thus, under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id . at 4277. The Court in Williams v. Taylor made it clear that the "contrary to" and "unreasonable application" clauses have independent meaning. Id. at 4275.

B. The Ex Post Facto Clause Issue

(a) Supreme Court cases

Inasmuch as our obligation under the AEDPA, 28 U.S.C. S 2254(d), as construed by the Supreme Court in Williams v. Taylor, is to determine whether the Delaware court's decisions in Cohen and Ferguson, were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," we must make an analysis of the Supreme Court's opinions and then consider the Delaware law and the Delaware Supreme Court's decisions within that analysis. Our starting point naturally is Article I, S 10 of the Constitution which provides that "[n]o State shall . . . pass any . . . ex post facto Law." Shortly after the Constitution was ratified, the Supreme Court identified four categories of penal laws that implicate the Ex Post Facto Clause, the third one of which was "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Calder v. Bull,

13

3 Dall. 386, 390, 1 L.Ed. 648 (1798). It is this category which Ferguson claims is implicated here. See br. at 21.

More than a century later, the Court reaffirmed the Calder v. Bull principle by holding that a law is ex post facto if it "makes more burdensome the punishment for a crime, after its commission[.]" Beazell v. Ohio, 269 U.S. 167, 169, 46 S.Ct. 68 (1925). The Court continues to adhere to that principle, see Lynce v. Mathis , 519 U.S. 433, 440-41, 117 S.Ct. 891, 895-96 (1997), and indeed"[t]he bulk of [the Supreme Court's] ex post facto jurisprudence has involved claims that a law has inflicted `a greater punishment, than the law annexed to the crime, when committed.' " Id. at 441, 117 S.Ct. at 895 (quoting Calder v. Bull, 3 Dall. at 390). Such laws are prohibited because they "implicate the central concerns of the Ex Post Facto Clause: `the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.' " Id., 117 S.Ct. at 896 (quoting Weaver v. Graham, 450 U.S. 24, 30, 101 S.Ct. 960, 965 (1981)).

In Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, the case on which the Delaware Supreme Court principally relied in Cohen, the Court considered an ex post facto challenge to a statute that changed "the function of the judge and jury in the imposition of death sentences in Florida between the time [Dobbert] committed the acts charged and the time he was tried for them." Id. at 287, 97 S.Ct. at 2295. At the time of Dobbert's offense, Florida law required the jury to impose a death sentence forfirst-degree murder, "unless the verdict included a recommendation of mercy by a majority of the jury." Id. at 288 & n.3, 97 S.Ct. at 2296 & n.3. But at the time of his sentencing, a new law which Florida enacted after the Florida Supreme Court invalidated its prior capital law as unconstitutional under Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726 (1972), provided that, after a murder conviction, there must be a separate sentencing hearing before the court and jury. See id. at 290, 97 S.Ct. at 2297. The new law required the jury to consider the aggravating and mitigating factors and render a non-binding advisory decision. See id. at 291, 97 S.Ct at 2297. The trial court then would weigh the same

14

evidence and, in its discretion, impose a sentence of life imprisonment or death. See id., 97 S.Ct. at 2297.

A majority of the jurors at Dobbert's trial, after considering the aggravating and mitigating factors, recommended life imprisonment. Nevertheless, the trial court rejected that recommendation and imposed a death sentence. Dobbert argued that application of the amended Florida statute constituted an ex post facto violation because it deprived him of "a substantial right to have the jury determine, without review by the trial judge, whether [the death penalty] should be imposed." Id. at 292, 97 S.Ct. at 2298.

The Supreme Court rejected that argument, ruling that "[t]he new statute simply altered the methods employed in determining whether the death penalty was to be imposed; [thus] there was no change in the quantum of punishment attached to the crime." Id. at 293-94, 97 S.Ct. at 2298. The Court explained that "[i]t is axiomatic that for a law to be ex post facto it must be more onerous than the prior law." Id. at 294, 97 S.Ct. at 2299. Specifically, to violate the Ex Post Facto Clause, the law must cause a "change in the quantum of punishment attached to the crime." Id., 97 S.Ct. at 2298. Therefore, "[e]ven though[a new law] may work to the disadvantage of a defendant [as it did in Dobbert ], a procedural change is not ex post facto." Id. at 293, 97 S.Ct. at 2298. The Court found that Florida's new law, insofar as it had no substantive effect on the range of sentences, i.e., life imprisonment or death for first-degree murder, did not change the quantum of punishment prescribed for the offense. Accordingly, the changes in the law were "merely procedural" and not ex post facto.1

_____

1. The Court also explained in Dobbert that a law is not ex post facto if it is "ameliorative," i.e., when "viewing the totality of the procedural changes wrought by the new statute, . . . the new statute did not work an onerous application of an ex post facto change in the law" because it afforded the defendant more safeguards or protections than the law in place at the time the offense was committed. See Dobbert, 432 U.S. at 296-97, 97 S.Ct. at 2300. The Delaware Supreme Court did not determine in Cohen or Ferguson whether the amended Delaware law was ameliorative; instead, it rejected the ex post facto challenge solely on the alternative ground that the changes enacted were"merely procedural."

15

Subsequently, in Weaver v. Graham, 450 U.S. 24, 101 S.Ct. 960, the Court considered a situation in which a Florida trial court sentenced the petitioner to 15 years in prison for second-degree murder at a time when a Florida law provided for mandatory reductions in the term of imprisonment based on "gain-time credits" earned through compliance with prison regulations. The legislature later amended the law to reduce the number of gain-time credits available to prisoners, thereby postponing the date when they would become eligible for early release. The Supreme Court held that application of the amended statute to the petitioner was an ex post facto violation because "the new provision constricts the inmate's opportunity to earn early release, and thereby makes more onerous the punishment for crimes committed before its enactment." Id. at 35-36, 101 S.Ct. at 968.

The Court identified in Weaver the "two critical elements" of an ex post facto law: "it must be retrospective . . . and it must disadvantage the offender affected by it." Id. at 29, 101 S.Ct. at 964. The Court noted that it also had held that there was not an "ex post facto violation . . . if the change effected is merely procedural, and does `not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt.' " Id. at 29 n.12, 101 S.Ct. at 964 n.12 (quoting Hopt v. Utah, 110 U.S. 574, 590, 4 S.Ct. 202, 210 (1884), and citing Dobbert, 432 U.S. at 293, 97 S.Ct. at 2298). The Court explained, however, that "[a]lteration of a substantial right . . . is not merely procedural, even if the statute takes a seemingly procedural form." Id., 101 S.Ct. at 964 n.12 (citing Thompson v. Utah, 170 U.S. at 354-55, 18 S.Ct. at 624, and Kring v. Missouri, 107 U.S. at 232, 2 S.Ct. at 452). The Court found that application of the amended gain time law in Weaver was an ex post facto violation because it "disadvantaged" the petitioner by making the punishment for his offense "more onerous" than the punishment prescribed at the time of the offense. The Court rejected the state's attempt to characterize the new law as "merely procedural," ruling that "the new provision reduces the quantity of gain time automatically available, and does not merely alter procedures for its allocation." Id. at 36 n.21, 101 S.Ct. at 968 n.21.

16

The Court also observed in Weaver that "a law may be retrospective not only if it alters the length of the sentence, but also if it changes the maximum sentence from discretionary to mandatory." Id. at 32 n.17, 101 S.Ct. at 966 n.17 (citing Lindsey v. Washington, 301 U.S. at 401, 57 S.Ct. at 799). The Court reached this conclusion because "[t]he critical question . . . is whether the new provision imposes greater punishment after commission of the offense, not merely whether it increases a criminal sentence." Id. (citations omitted).

The Court's decision in Lindsey v. Washington exemplifies this principle. In Lindsey the Court ruled that a law is ex post facto if its effect "is to make mandatory what was before only the maximum sentence." 301 U.S. at 400, 57 S.Ct. at 798-99. At the time of the petitioners' grand larceny offenses in Lindsey, they had been subject to a statutory minimum sentence of six months to five years and a maximum sentence of not more than 15 years, with the court required to impose an indeterminate sentence up to whatever maximum it selected, but not to exceed 15 years. See id. at 398, 57 S.Ct. at 797. But the legislature amended the law before the petitioners' sentencing so that the court was required to impose a 15-year sentence and a defendant could obtain earlier release only through the grace of the parole board. See id. at 398-99, 57 S.Ct. at 798. The trial court imposed sentence under the new law.

In finding an ex post facto violation in Lindsey, the Court held that "the measure of punishment prescribed by the later statute is more severe than that of the earlier." Id. at 401, 57 S.Ct. at 799. Specifically, although a sentence of 15 years had been permissible under the law at the time of the offenses, 15 years became the only sentence that the court could impose under the new law. Moreover, the new law eliminated the trial court's discretion to impose a shortened sentence. Thus, the Court held that the new law imposed a more severe punishment after commission of the offense, and violated the Ex Post Facto Clause.[2]  In Miller v. Florida,
_____

2. Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, effectively overruled the aspect of the Court's decision in Lindsey that the law was ex post facto merely because it worked to the detriment or "substantial

17

482 U.S. 423, 107 S.Ct. 2446, the Court ruled that a revision in Florida's sentencing guidelines which became effective between the date of the petitioner's offense and the date of his conviction violated the Ex Post Facto Clause because the new guideline was "more onerous than the prior law." Id. at 431, 107 S.Ct. at 2452 (quoting Dobbert, 432 U.S. at 294, 97 S.Ct. at 2299). At the time of the offense, the petitioner faced a presumptive sentence of three and one-half to four and one-half years in prison, but at the time of sentencing, the revised guidelines called for a presumptive sentence of five and one-half to seven years. In fact, the trial court sentenced the petitioner to seven years. See id. at 425, 107 S.Ct. at 2448.

The Court held in Miller that the petitioner had been "substantially disadvantaged" by the change in Florida's law because under the prior law the sentencing judge would have had to depart from the guidelines to impose a seven-year term of imprisonment and provide a statement of clear and convincing reasons for the departure reviewable on appeal. See id. at 432, 107 S.Ct. at 2452. Under the revised law, the seven-year term was within the guidelines range and was unreviewable on appeal. Consequently, the Court concluded that by foreclosing the petitioner's ability "to challenge the imposition of a sentence longer than his presumptive sentence under the old law," id. at 433, 107 S.Ct. at 2452, the new law worked a "substantial disadvantage" to him. Accordingly, the Court held that the new law violated the Ex Post Facto Clause.

However, the Court in Miller, taking note of its holding in Dobbert, explained that, even when application of a new law works to a defendant's "disadvantage," the ex post facto prohibition "does not restrict `legislative control of remedies and modes of procedure which do not affect matters of substance.' " Id. at 433, 107 S.Ct. at 2452 (quoting Dobbert,

_____

disadvantage" of the defendants, see Lindsey , 301 U.S. at 401-02, 57 S.Ct. at 799. Nevertheless, the Court in Collins  did not overrule Lindsey's
holding, as well as its assessment that the change in the law in Lindsey was ex post facto because "the measure of punishment prescribed by the later statute is more severe than that of the earlier."

18

432 U.S. at 293, 97 S.Ct. at 2298). Hence, the Court will not find an "ex post facto violation . . . if the change is merely procedural and does `not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt.' " Id. , 107 S.Ct. at 2452–53 (quoting Hopt v. Utah, 110 U.S. at 590, 4 S.Ct. at 210, and citing Dobbert, 432 U.S. at 293–94, 97 S.Ct. at 2298). The Court added, however, that "a change in the law that alters a substantial right can be ex post facto,`even if the statute takes a seemingly procedural form.' " Id., 107 S.Ct. at 2453 (quoting Weaver, 450 U.S. at 29 n.12, 101 S.Ct. at 964 n.12).

Applying Dobbert, the Court in Miller  observed that, "[a]lthough the distinction between substance and procedure might sometimes prove elusive, here the change at issue appears to have little about it that could be deemed procedural." Id., 107 S.Ct. at 2453. The Court found that "[t]he 20% increase in points for sexual offenses in no wise alters the method to be followed in determining the appropriate sentence: it simply inserts a larger number into the same equation." Id., 107 S.Ct. at 2453. Thus, the Court refused to characterize the revisions to Florida's sentencing guidelines as "merely procedural."

In Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, the Court abandoned portions of its analysis in Weaver and Miller, and it narrowed the scope of the framework for analyzing ex post facto claims. In Collins, the Court considered a situation in which a state court jury convicted the petitioner and sentenced him to life imprisonment plus a fine of $10,000. The petitioner argued in the state courts that the fine had been unauthorized under the law in effect at the time of sentencing, and he requested a new trial. Relying on an intervening change in state law not in effect at the time of the offense, the trial, or the sentencing, which allowed it to reform an improper jury verdict that assessed an unauthorized punishment, the state appellate court reformed the verdict by vacating the fine. Therefore, the appellate court denied the petitioner's request for a new trial, a form of relief to which he would have been entitled under state case law prior to enactment of the new statute. Id. at 39–40, 110 S.Ct. at 2717–18.

19

In his federal habeas petition in Collins, the petitioner claimed an ex post facto violation by reason of the use of the new jury verdict reformation law. The district court, however, denied relief on the ground that his punishment "was not increased (but actually decreased)" as a result of the change in the law. See id. at 40, 110 S.Ct. at 2718 (internal quotation marks omitted). The Court of Appeals for the Fifth Circuit reversed, holding that, under Thompson v. Utah, 170 U.S. 343, 18 S.Ct. 620, retroactive applications of procedural statutes "violate the Ex Post Facto Clause unless they leave untouched all substantial protections with which existing law surrounds the person accused of the crime." Id. (internal quotation marks omitted). The court of appeals held that the petitioner's right to a new trial under the governing case law was a "substantial protection," and thus it ordered the district court to grant habeas relief.

The Supreme Court reversed, concluding that the definition of "ex post facto" that it had adopted in Beazell v. Ohio, 269 U.S. 167, 46 S.Ct. 68, was "faithful to the use of the term `ex post facto law' at the time the Constitution was adopted." Id. at 44, 110 S.Ct. at 2720. In Beazell, the Court ruled that a law is ex post facto if it "punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission; or which deprives one charged with crime of any defense available according to law at the time when the act was committed." Beazell, 269 U.S. at 169, 46 S.Ct. at 68. Limiting its analysis to these three "Beazell categories," the Court in Collins rejected the petitioner's ex post facto claim.

The Court found that the sentencing reformation law was merely "a procedural change that allow[ed] reformation of improper verdicts." Collins, 497 U.S. at 44, 110 S.Ct. at 2720. It thus rejected the court of appeals' holding that the statute, although clearly procedural, was nevertheless ex post facto because it denied the petitioner a "substantial protection," i.e., the right to a new trial that had been available at the time of sentencing. The Court noted that "[s]everal of [its] cases have described as `procedural' those changes which, even though they work to the disadvantage

20

of the accused, do not violate the Ex Post Facto Clause." Id. at 45, 110 S.Ct. at 2720 (citing Dobbert, 432 U.S. at 292–93 & n.6, 97 S.Ct. 2297–98 & n.6; Beazell, 269 U.S. at 171, 46 S.Ct. at 69; Mallett v. North Carolina, 181 U.S. 589, 597, 21 S.Ct. 730, 733 (1901)). The Court added that, "[w]hile these cases do not explicitly define what they mean by the word `procedural,' it is logical to think that the term refers to changes in the procedures by which a criminal case is adjudicated, as opposed to changes in the substantive law of crimes." Id.

The Court observed, however, that it also had stated in several cases "that a procedural change may constitute an ex post facto violation if it `affect[s] matters of substance,' . . . by depriving a defendant of `substantial protections with which the existing law surrounds the person accused of crime,' . . . or arbitrarily infringing upon`substantial personal rights.' " Id. (citations omitted). The Court found that such language had "imported confusion into the interpretation of the Ex Post Facto Clause." Id. at 45, 110 S.Ct. at 2721. Thus, the Court ruled in Collins that "[t]he references in [earlier cases] to `substantial protections' and `personal rights' should not be read to adopt without explanation an undefined enlargement of the Ex Post Facto Clause" as defined in Beazell. See id. at 46, 110 S.Ct. at 2721. The Court explained that the proper meaning of those earlier cases is that "by simply labeling a law `procedural,' a legislature does not thereby immunize it from scrutiny under the Ex Post Facto Clause." Id. at 46. Ultimately, the Court in Collins expressly overruled Thompson v. Utah, 170 U.S. 343, 18 S.Ct. 620, and Kring v. Missouri, 107 U.S. 221, 2 S.Ct. 443, two cases which the Court had cited in Weaver for the proposition that "[a]lteration of a substantial right . . . is not merely procedural, even if the statute takes a seemingly procedural form." Weaver, 450 U.S. at 29 n.12, 101 S.Ct. at 964 n.12.3

In California Department of Corrections v. Morales, 514 U.S. 499, 115 S.Ct. 1597 (1995), the Court explained that, in light of the framework it set forth in Collins, "the focus

_____

3. Miller cited Weaver for the same point. Miller, 482 U.S. at 433, 107 S.Ct. at 2453.

21

of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of `disadvantage,' " as language in Miller, Weaver and Lindsey had suggested. Rather, the proper focus is limited to whether the change in the law "alters the definition of criminal conduct or increases the penalty by which a crime is punishable." Id. at 506 n.3, 115 S.Ct. at 1602 n.3. The Court noted in Morales that it nevertheless had reached the correct result in those three cases because in each of them the law at issue impermissibly increased the "quantum of punishment" that had been prescribed at the time of the offense. Id. at 505-06 & n.3, 115 S.Ct. at 1601-03 & n.3.

The particular holding in Morales was that an amendment to California's parole procedures which decreased the frequency of parole hearings for certain offenders had not changed the quantum of punishment attached to the petitioner's offense, and therefore was not ex post facto. The amendment allowed the Parole Board, after holding an initial hearing, to defer for up to three years a subsequent parole suitability hearing for prisoners convicted of multiple murders if the Board found that it was unreasonable to expect that it would grant parole at a hearing during the subsequent years. The Court explained that the relevant inquiry is whether the "change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." Id. at 506 n.3, 115 S.Ct. at 1602 n.3. The Court determined that "there is no reason to conclude that the amendment will have any effect on any prisoner's actual term of confinement." Id. at 512, 115 S.Ct. at 1604. Thus, the Court found that the petitioner failed to show, as required under Collins, that the new law actually had increased, and not merely posed an attenuated or theoretical possibility of increasing, the quantum of punishment for his offense.

The Court rejected the petitioner's argument that"the Ex Post Facto Clause forbids any legislative change that has any conceivable risk of affecting a prisoner's punishment." Id. at 508, 115 S.Ct. at 1602. The Court noted that "the question of what legislative adjustments will be held to be of sufficient moment to transgress the [ex post facto] prohibition must be a matter of degree." Id. at 509, 115

S.Ct. at 1603 (internal quotation marks omitted). Thus, the Court declined "to articulate a single `formula' for identifying those legislative changes that have a sufficient effect on substantive crimes or punishments to fall within the prohibition." Id. The Court ruled that the law at issue in Morales "creates only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes, and such conjectural effects are insufficient under any threshold we might establish under the Ex Post Facto Clause." Id. at 509, 115 S.Ct. at 1603 (citing Dobbert, 432 U.S. at 294, 97 S.Ct. at 2299).

In Lynce v. Mathis, 519 U.S. 433, 117 S.Ct. 891, the Court again applied Collins and inquired whether the law at issue retrospectively increased the quantum of punishment for the petitioner's offense. The law challenged in Lynce canceled the petitioner's award of 1,860 days of provisional early release credits, which had been granted for the sole purpose of alleviating prison overcrowding. The Court concluded that the new law was ex post facto because its effect was to lengthen the petitioner's sentence, thereby retrospectively increasing the quantum of punishment. See id. at 445, 117 S.Ct. at 897–98.

But in Lynce, unlike in Morales, the new law actually increased the petitioner's term of incarceration so its effect was neither speculative nor attenuated. The Court rejected in Lynce any suggestion that the new law was"merely procedural." Id. at 447 n.17, 117 S.Ct. at 898 n.17. The Court cited Dobbert for the proposition"that a procedural statute is one that `simply alters the methods employed in determining' whether the punishment is `to be imposed' rather than `chang[ing] the quantum of punishment attached to the crime.' " Id. (quoting Dobbert, 432 U.S. at 293–94, 97 S.Ct. at 2298) (internal punctuation omitted) (alteration in original). The Court ruled that, unlike in Dobbert, the law challenged in Lynce was not "merely procedural" because it "did not change the method of determining the sentence, but rather lengthened the sentences of certain prisoners by making them ineligible for early release[.]" Id.

23

Recently in Garner v. Jones, 120 S.Ct. 1362 (2000), the Court was concerned with a situation similar to that in Morales in that it considered an ex post facto challenge to a rule extending the time for required reconsideration of denied parole applications from every three years to every eight years. Based on the record presented, the Court upheld the application of the amended rule, as the prisoner had not demonstrated that it created "a significant risk of prolonging [his] incarceration," and "the requisite risk [was] not inherent in the framework" of the rule. Id. at 1368. The Court cited Morales for the point that the Ex Post Facto Clause should not be employed for the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures. Id. Moreover, the Court noted that the ex post facto doctrine included to some extent the concept that before a criminal commits an offense, he should have either actual or constructive notice of the penalty for the transgression. Id. at 1369.

In Garner, however, the Court did not make a definitive statement of the scope of ex post facto protections. Indeed, the Court did not make an analysis of Beazell , Collins, Dobbert, or Lindsey, the cases which, as will be seen, we regard as its most significant on the ex post facto issue we consider here. In fact, the Court did not cite Dobbert or Lindsey. Rather, Garner's particular significance is in the area of modification of parole procedures.

The Court's most recent ex post facto case is Carmell v. Texas, 68 U.S.L.W. 4325 (U.S. May 1, 2000). In Carmell the Court was concerned with a section of a Texas statute which provided that in certain sexual offenses a conviction "is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within six months after the date on which the offense is alleged to have occurred." Id. at 4326. This requirement is referred to as an "outcry" provision. Until September 1, 1993, the requirement that the victim inform another person of the alleged offense did not apply "if the victim was younger than 14 years of age at the time of the alleged offense." Id. The statute, however, was amended in 1993 to extend the child victim exception to victims under 18 years

24

old. The convictions at issue in Carmell were for offenses before the amendment when the victim was 14 or 15 years old. Id. at 4327. Thus, the petitioner argued that the convictions could not stand under the Ex Post Facto Clause because the victim was not under 14 years old at the time of the offenses and she had not made a timely outcry. The Texas courts rejected his argument, upholding the application of the statutory amendment against an ex post facto challenge.

The Supreme Court reversed. It held that in Collins it had not intended to suggest that in Beazell it had abandoned the fourth Calder category, i.e., see Calder, 3 Dall. at 390, that the Ex Post Facto Clause precludes a "law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." Id. at 4330. Thus, it held that the 1993 amendment to the Texas law was ex post facto as applied to the petitioner because it reduced the "quantum of evidence" necessary to convict the petitioner inasmuch as without the amendment he could not have been convicted on the counts in question. Carmell like Garner did not, however, make a definitive statement of the scope of ex post facto protections as it was dealing with a narrow situation not concerned with the quantum of punishment. Moreover, it dealt with a Calder category of ex post facto laws not implicated on this appeal.

Having completed our review of the Supreme Court's ex post facto cases we now return to consideration of our obligations under Williams v. Taylor. As we have indicated the "contrary to" and "unreasonable application" clauses in 28 U.S.C. S 2254(d)(1) have independent meaning. See Williams v. Taylor, 68 U.S.L.W. at 4275. Thus, claims may fit within one of these clauses more "comfortably" than the other. See id. But still when a petitioner presents a claim as does Ferguson which challenges a statutory scheme rather than only the outcome in a particular case we believe that we have an obligation to make our analysis under both clauses, particularly inasmuch as Ferguson has presented his ex post facto claim under both clauses.

25

We turn to the "contrary to" clause first as 28 U.S.C. S 2254(d)(1) lists it first. In light of our foregoing analysis of the Supreme Court's ex post facto cases, we conclude that the Court has established certain ex post facto rules with sufficient specificity so that we may make a determination under the AEDPA whether the Delaware Supreme Court's decisions in Cohen and Ferguson were contrary to clearly established federal law as determined by the Supreme Court of the United States. In particular, under the framework set forth in Collins, a law violates the Ex Post Facto Clause if it is both retrospective and increases the penalty by which a crime is punishable, a standard which requires the petitioner to show that the law retrospectively increased or made more onerous the "quantum of punishment" attached to the crime. The infringement of a "substantial right" or a showing of a mere"disadvantage" as a result of a new law is insufficient.

In addition, as the Court explained in Dobbert  and Collins, a law is "merely procedural," and not ex post facto, if it simply alters the methods employed in determining the punishment to be imposed as opposed to working a substantive change in the quantum of punishment attached to the crime. Moreover, the Court consistently has applied these rules, and they are quite specific. Thus, we conclude that the Supreme Court cases formulate rules to apply when an ex post facto claim is made so that we can consider the Delaware Supreme Court's decision in Cohen, and hence its decision in Ferguson, under the AEDPA's "contrary to" clause.

We emphasize that Lindsey did not establish a sufficiently specific "framework" or rule of law that is any different from the rules we have noted. In Lindsey, the Court found a law to be ex post facto because its effect was "to make mandatory what was before only the maximum sentence." Lindsey, 301 U.S. at 400, 57 S.Ct. at 798-99. That holding survives under Collins because, as the Court noted in Morales, it is clear that the law challenged in Lindsey impermissibly increased the "quantum of punishment" prescribed at the time of the offense. See Morales, 514 U.S. at 505-06 & n.3, 115 S.Ct. at 1601-02 & n.3. Thus, while it might be argued that Lindsey

26

established a rule that "a law is ex post facto if it makes mandatory what was before only the maximum sentence," in view of the Court's subsequent refinements it is more accurate to say that the rule in Lindsey is that a statute is ex post facto if it retroactively makes the quantum of punishment for an offense more onerous. Of course, there was such a violation in Lindsey because the new law made mandatory a sentence that was only a maximum at the time of the petitioners' offenses.

The Court, however, did not define formally in Lindsey what makes a law "mandatory" for ex post facto purposes, and it did not expressly generalize its holding into a framework or rule for future cases. In addition, while the Court in Weaver cited Lindsey for the proposition that "a law may be retrospective not only if it alters the length of the sentence, but also if it changes the maximum sentence from discretionary to mandatory," 450 U.S. at 32 n.17, 101 S.Ct. at 966 n.17, it did so to illuminate its point that "the critical question" in an ex post facto analysis "is whether the new provision imposes greater punishment after commission of the offense, not merely whether it increases a criminal sentence." Id. Thus, rather than establishing a framework or rule of law in its own right, we regard Lindsey as merely one of the continuum of cases applying the Beazell categories the Court reaffirmed in Collins, and which the Court further explained in Carmell.

Carmell, of course, does not supply an ex post facto rule applicable here as it merely held that the state could not reduce the quantum of evidence necessary to convict the petitioner, at least in the manner it did, an application of the Ex Post Facto Clause not implicated here. Moreover, the Court emphasized that "a sufficiency of the evidence rule resonates with the interest to which the Ex Post Facto Clause is addressed" because "the elements of unfairness and injustice in subverting the presumption of innocence are directly implicated by rules lowering the quantum of evidence required to convict." Carmell, 68 U.S.L.W. at 4335. These interests, derived from the fourth Calder category, are not involved in this case.

(b) The Delaware Supreme Court's opinions

Against this backdrop of relevant Supreme Court jurisprudence, we return now to the Delaware Supreme

27

Court's decision in Cohen, and hence its ruling in Ferguson, so that we may consider each under the AEDPA standards as clarified in Williams v. Taylor. The state court first ruled in Cohen that, "[g]iven the teaching in Dobbert, it is clear that the changes effected by Delaware's new death penalty statute are procedural. The revisions in the new law, like those in Dobbert, merely altered the method of determining imposition of the death penalty. The quantum of punishment for the crime of first-degree murder in Delaware remains unchanged." Cohen, 604 A.2d at 853. The Court added in Ferguson that, "[t]he restrictive nature of the advisory jury's findings and the mandatory imposition of the death penalty by the sentencing judge under the amended statute are likewise `procedural,' and therefore do not implicate ex post facto concerns." Ferguson, 642 A.2d at 783.

It is unquestionable that the changes enacted by the amended Delaware law simply have "altered the methods employed in determining the punishment to be imposed." For example, like the law at issue in Dobbert , Delaware's amended law reassigned the task of imposing sentence from the jury to the court, a change which Ferguson's attorney at oral argument before us acknowledged in itself did not implicate ex post facto concerns and in light of Dobbert hardly could have done so.4  In addition, the amended statute retained life imprisonment or death as the range of sentences for first-degree murder, and merely redesigned the method or formula for determining which of the two sentencing choices should be imposed in a given case. Thus, we are satisfied that the amended Delaware law fully justified the state court's reliance on Dobbert and its conclusion that the changes were "merely procedural."

Nevertheless we must continue our analysis because at the time of Ferguson's offenses, Delaware did not require a death sentence when aggravating circumstances were found to outweigh mitigating circumstances, as the jury could impose a sentence of life imprisonment in that
_____

4. We also note that in general there is no federal constitutional right to a jury trial on sentencing in a capital case. See Clemons v. Mississippi, 494 U.S. 738, 745-46, 110 S.Ct. 1441, 1446-47 (1990).

28

circumstance. At the time of his sentencing, however, the amended law required a death sentence once the court determined that aggravating circumstances outweighed mitigating circumstances.

While these changes arguably implicate the holding under Lindsey, the Delaware Supreme Court in Cohen distinguished Lindsey by ruling that the amended law

> is not `mandatory' . . . [because] imposition of the death penalty is based upon the predicate factual findings made by the jury and trial judge as to aggravating and mitigating circumstances. The existence of such factors and their relative weight, although ultimately determined by the trial judge, do not mandate a death sentence unless the aggravating factors outweigh the mitigating circumstances. Thus, the new law is not `impermissibly mandatory.'

Cohen, 604 A.2d at 855. As we have indicated, in support of this proposition the court cited Walton v. Arizona, 497 U.S. at 650-52, 110 S.Ct. at 3056; Blystone v. Pennsylvania, 494 U.S. at 306-07, 110 S.Ct. at 1083; Boyde v. California, 494 U.S. at 374, 110 S.Ct. at 1195; and Proffitt v. Florida, 428 U.S. at 260-61, 96 S.Ct. at 2970. Of course, each of those cases presented a challenge to a death penalty statute under the Eighth Amendment which prohibits the imposition of an "impermissibly mandatory" death sentence, i.e., a death sentence that is imposed automatically upon conviction without an individualized inquiry into the defendant and the nature of the crime. See, e.g., Blystone, 494 U.S. at 305, 110 S.Ct. at 1082-83. The cases nevertheless are germane to the question of whether the amended sentencing statute "increased the quantum of punishment" for Ferguson's capital offenses, which is the relevant inquiry under the Ex Post Facto Clause, as the ex post facto inquiry considers the alleged mandatory aspects of a sentencing. See Lindsey, 301 U.S. at 400, 57 S.Ct. at 798-99; see also Morales, 514 U.S. at 506 n.3, 115 S.Ct. at 1602 n.3.

The Delaware Supreme Court in Cohen further distinguished Lindsey and its own opinion in Dickerson by ruling that a death sentence under the amended law is not

29

truly "mandatory" because the trial court must assign a "relative weight" to the aggravating and mitigating evidence before it determines which sentence, life imprisonment or death, is required by the statute. Therefore, given the presence of a "weighing process," the Delaware court concluded that "[t]he sentencing process remains basically discretionary, merely shifting the ultimate decision from the jury to the trial judge." Cohen, 604 A.2d at 855.

Thus, though the jury convicted Ferguson of first-degree murder the court did not impose a death sentence automatically. Rather, it held a separate hearing to determine whether to impose a sentence of life imprisonment or death. Before imposing sentence, the trial court weighed the evidence presented at the hearing as well as the jury's sentencing recommendation, and then made a determination that in Ferguson's case the aggravating circumstances outweighed the mitigating circumstances. Obviously, the court could have reached the opposite result in this inherently subjective evaluation for aggravating circumstances cannot outweigh mitigating circumstances in the definitive sense that a ton necessarily outweighs a pound. Accordingly, it is perfectly clear that, as the Delaware Supreme Court explained, the "weighing process" effectively insured that the death penalty was a discretionary maximum sentence, and therefore, the death sentence was not "mandatory" in the sense contemplated in Lindsey.[5]

The district court agreed with the Delaware Supreme Court's analysis, citing the following rationale:

> The current case is somewhat different from Lindsey. The revised Delaware statute does not make the maximum penalty for first-degree murder, death, mandatory. The options remain the same: life imprisonment or death. The difference is that under the old statute the decisionmaker needed to weigh the aggravating and mitigating factors, but was not

_____

5. Moreover, although our conclusion is not dependent on this point, we are satisfied that if the court held that the mitigating circumstances outweighed the aggravating circumstances, its determination would not have been subject to appellate review.

30

> necessarily compelled by the outcome of that weighing
> process. Under the revised law, if the aggravating
> circumstances are found to outweigh the mitigating
> circumstances, then a decision of death is commanded.
> If the opposite conclusion is reached, a sentence of life
> imprisonment is required. The discretion of the
> sentencing authority is therefore not eliminated, but is
> restricted to a reasoned consideration of relevant
> aggravating and mitigating circumstances. The
> sentencing decision has not been reduced to a
> mechanical exercise, as it was in Lindsey.

Ferguson v. State, 1996 WL 1056727, at *9.

We find this analysis compelling and thus we will not
hold that Lindsey "required" the Delaware Supreme Court
to find that the amended law violated the Ex Post Facto
clause or that there was an ex post facto violation in this
case. Indeed, in our view we could not possibly hold that
the Delaware Supreme Court's opinions in Cohen  and
Ferguson were "opposite" to any opinions of the Supreme
Court. While Delaware's amended law undoubtedly
established standards for a trial court to consider when
imposing sentence in a capital case, the law did not
eliminate discretion from the sentencing process, something
which Lindsey suggested is required to establish an ex post
facto violation. See Lindsey, 301 U.S. at 400–01, 57 S.Ct. at
798–99.

We recognize that the amended law eliminates the
possibility that a defendant will receive a life sentence on
the basis of a single juror refusing to vote for death.
Consequently, we think that it is reasonable to believe that
the amended law makes it more likely that a defendant will
receive a death sentence than would have been the case
under the earlier law. But that circumstance only
establishes that a defendant is "disadvantaged" by the
amended law, which is an insufficient basis to establish an
ex post facto violation unless the change in the law actually
increased the quantum of punishment for the offense. 6 See

_____

6. We note that the dissenting opinion in Garner pointed out that the
parole board's chairman said its policies "were intended to increase time
served in prison." Garner, 120 S.Ct. at 1373 (Souter, J., dissenting).
Apparently, the majority was not moved by this observation.

31

Morales, 514 U.S. at 506 n.3, 115 S.Ct. at 1602 n.3. In sum, we have considered all of the Supreme Court cases and simply cannot find that the decisions of the Supreme Court of Delaware in Cohen and Ferguson are contrary to any of them, at least to the extent that they have not been overruled. In fact, we would have reached the result we do even if we exercised independent judgment in the way required before the adoption of the AEDPA. See Williams v. Taylor, 68 U.S.L.W. at 4274. In the circumstances, if we found an ex post facto violation here we surely would be unfaithful to our obligations under the AEDPA.

Our conclusion that the decisions in Cohen and Ferguson upholding the amended law do not violate the "contrary to" clause of the AEDPA takes us to the question of whether the Delaware court's result nevertheless was an unreasonable application of clearly established federal law as determined by the United States Supreme Court. See 28 U.S.C. S 2254(d)(1). In considering this possibility we will not repeat our analysis of the Supreme Court cases. Rather, we merely state that we are satisfied that we cannot hold that the Delaware Supreme Court's opinions in Cohen and Ferguson were an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Quite to the contrary, we have no basis to hold that the Delaware Court unreasonably applied the Supreme Court's ex post facto cases to the facts of this case or unreasonably refused to extend ex post facto principles to this case. See Williams v. Taylor, 68 U.S.L.W. at 4276. Indeed, we think that the Delaware Supreme Court reached the correct result and, as we have indicated, even exercising the independent judgment required by pre-AEDPA law we would have come to the result it did.

We close our consideration of the ex post facto issue with a final observation. Ferguson argues that under the amended law the percentage of defendants convicted of first degree murder sentenced to death has increased substantially from the percentage under the earlier law in effect at the time of his offenses. This contention, however, even if true is without legal significance because the legislature neither has increased nor made mandatory the penalty for first-degree murder and the mere fact, if such

32

be the case, that the change disadvantaged Ferguson and other defendants in capital cases cannot lead us to a different result. Moreover, we must consider the increased imposition of the death penalty against the circumstance that under the amended law the court as opposed to a unanimous jury must determine to impose a death penalty. Surely it would be expected that, in light of that difference, there would have been more sentences of death. Yet, as we have indicated, Ferguson acknowledges that the transfer of the responsibility to make the ultimate decision to the court does not in itself raise ex post facto concerns and plainly it does not. Thus, we reject Ferguson's ex post facto arguments.

C. Duplicative Aggravating Statutory Circumstances

As we have indicated, during the penalty phase of Ferguson's case, the state advanced three statutory aggravating circumstances in support of the death penalty: (1) Ferguson previously had been convicted of murder, manslaughter or a violent felony;[7] (2) he committed the murder in this case for pecuniary gain; and (3) he committed the murder during the course of a robbery. Both the jury and the court found that the prosecution had proven each of the three aggravating circumstances with respect to both counts of first degree murder. But Ferguson contends that murder for pecuniary gain and murder during the course of a robbery are the same aggravating factor as a person who attempts to rob someone necessarily seeks pecuniary gain. Thus, in his view, the court permitted the jury to "double count" the factor. Accordingly, he argues, the sentencing scheme was arbitrary and capricious in violation of the Eighth Amendment.

(a) Exhaustion

The state argues, as it did in the district court, that the duplicate aggravating circumstances claim is unexhausted because Ferguson did not present it to the state courts in terms of the denial of a federal right. See Duncan v. Henry, 513 U.S. 364, 365–66, 115 S.Ct. 887–88 (1995) (per

_____

7. The evidence established that Ferguson had been convicted of murder and aggravated assault.

33

curiam). Yet in his supplemental opening brief to the Delaware Supreme Court, Ferguson cited Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926 (1992), in support of his argument that the court should have instructed the jury to consider these two duplicative factors as one when balancing the aggravating and mitigating factors. In Espinosa, the Supreme Court held that in states where the sentencer must weigh the aggravating and mitigating factors, the weighing of an invalid factor violates the Eighth Amendment. Id. at 1082, 112 S.Ct. at 2928. Thus, Ferguson supported his argument by citing Supreme Court case law which directly addressed the Eighth Amendment argument he advanced. Accordingly, he did present his duplicative aggravating circumstance claim in terms of the denial of the same federal right he asserts here.

The state nevertheless emphasizes that the Delaware Supreme Court did not analyze Ferguson's duplicative circumstances claim in federal terms. But to satisfy the exhaustion requirement, a defendant only need have given the state courts the opportunity to pass on the merits of a claim. See Picard v. Connor, 450 U.S. 270, 275, 92 S.Ct. 509, 512 (1971). Moreover, in its opinion in Ferguson, the Delaware Supreme Court indicated that it previously had held in Deputy v. State, 500 A.2d 581 (Del. 1985), that "the question of whether these aggravating circumstances are `duplicative' is a matter of statutory construction, rather than an issue of constitutionality." Ferguson , 642 A.2d at 782 (citing Deputy, 500 A.2d at 600-01). However, in Deputy the court relied on its previous decision in Flamer v. State, 490 A.2d 104, 125 (Del. 1983), which had noted that in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909 (1976), the United States Supreme Court upheld a sentence of death in which these same two allegedly duplicative aggravating circumstances were presented to the jury without an instruction to treat them as a single factor. See Deputy, 500 A.2d at 600-01. The Delaware court in Deputy noted that in Gregg the Supreme Court held that the "statutory system under which [the defendant] was sentenced to death does not violate the Constitution." Id. at 600-01. Therefore, it appears that the Delaware Supreme Court in Ferguson's case limited its review to a question of statutory construction in reliance on its conclusion that the

34

Supreme Court had rejected the constitutional basis for the argument. It thus did not confine its review because Ferguson failed to assert a constitutional claim. Accordingly, the duplicative aggravating statutory circumstances claim is exhausted.

(b) Merits of the claim

In our view, the Delaware court read Gregg v. Georgia too broadly. In Gregg, although the petitioner attacked certain aggravating circumstances as vague and therefore violative of the Eighth Amendment, he did not raise a duplicative aggravating circumstances argument before the Supreme Court. Indeed, the Court emphasized that it was reviewing the sentencing system "as a whole". See Gregg, 428 U.S. at 200, 96 S.Ct. at 2938. Thus, notwithstanding the Delaware court's reliance on Gregg, we are satisfied that it did not pass on Ferguson's Eighth Amendment constitutional duplicative aggravating circumstances argument, even though it had the opportunity to do so. Accordingly, we cannot say that the Delaware Supreme Court took into account controlling Supreme Court decisions. This point is critical because under the AEDPA the limitation on the granting of an application for a writ of habeas corpus is only "with respect to any claim that was adjudicated on the merits in State court proceedings." Hence we exercise pre-AEDPA independent judgment on the duplicative aggravating circumstances claim.

In considering the duplicative aggravating circumstances claim, we recognize that the Delaware Supreme Court's interpretation of state law is entitled to deference. The court rejected the claim, holding that under Delaware law, the robbery and pecuniary gain claims are not always duplicative. See Ferguson, 642 A.2d at 782. It noted that in Delaware robbery is defined as forcible theft, which "encompasses two separate concepts: `[T]he actor may intend to deprive the owner of property, or his mind may be focused rather on gain to himself or another mind entitled thereto.' " Id. (emphasis in original). The court therefore concluded that not all robberies are committed for pecuniary gain and thus "those two factors are not always duplicative." Id. But the Delaware Supreme Court's explanation of state law does not resolve the duplicative

35

aggravating circumstances claim for the court at Ferguson's trial did not instruct the jury with respect to the two concepts of theft. See app. at 109-19. Moreover, there was no evidence at the trial that Ferguson intended to deprive his victim of his money for any other purpose other than pecuniary gain. Consequently, the distinction dependent on the nature of the theft the Delaware Supreme Court in Ferguson drew was not tied to the circumstances surrounding the consideration of the aggravating factors at Ferguson's trial.

We also recognize that the Delaware Supreme Court further distinguished the two aggravating factors as follows: "Robbery, as an aggravating factor, focuses on the means of accomplishing the crime, i.e., force. Pecuniary gain, as an aggravating factor, focuses on the motive for the crime, i.e. either gain or owner deprivation." Ferguson , 642 A.2d at 782 (emphasis in original). Once again, although the two aggravators may be conceptually distinct, the trial court did not instruct the jury to consider these concepts in the discrete way the Delaware Supreme Court described them and consequently, whatever might be true in other cases, the distinction the court made is not germane here. See app. at 109-19. Accordingly, we cannot resolve the duplicative aggravating circumstances issue by holding that in fact at Ferguson's trial the pecuniary gain and robbery circumstances were not duplicative.

Nevertheless, even assuming arguendo that the robbery and pecuniary gain factors were duplicative in this case, we are satisfied that the jury's consideration of them did not constitute an Eighth Amendment violation. We held in Flamer v. Delaware, 68 F.3d 736 (3d Cir. 1995) (en banc), that Delaware's death penalty statute prior to its 1991 amendment was a "non-weighing statute," that is, after the jury narrowed the class of persons eligible for the death penalty based on a finding of at least one statutory aggravating factor, it then determined whether the aggravating circumstances, statutory or not, outweighed the mitigating circumstances. See id. at 745-49. The latter stage of the sentencing process is described as the "selection" stage because the jury determines whether the particular defendant found to be eligible for the death

36

penalty should be sentenced to death. See United States v. McCullah, 76 F.3d 1087, 1106 (10th Cir. 1996). 8 We reiterate that in making this selection in a non-weighing state the jury considers all aggravating circumstances, not merely those enumerated in the statute. See Flamer, 68 F.3d at 749. In contrast, during this latter stage under a "weighing statute," the jury is required to weigh only the statutory aggravating factors against any mitigating factors.

Determining whether a sentencing scheme is a "weighing statute" is pivotal in our duplicative circumstances inquiry. In Clemons v. Mississippi, 494 U.S. 738, 754, 110 S.Ct. 1441, 1451 (1990), the Court held that in a weighing state if the jury considers an invalid statutory aggravating circumstance at the selection stage, on appeal the court either must reweigh the remaining valid statutory aggravators and any mitigating circumstance or make a harmless error analysis. But Zant v. Stephens , 462 U.S. 862, 881, 103 S.Ct. 2733, 2745 (1983), held that in a non-weighing state the consideration of an invalid statutory aggravator at the narrowing stage does not render a death verdict at the selection stage constitutionally infirm, provided there is at least one valid statutory aggravator rendering the defendant death penalty eligible. Plainly if Zant is applicable Ferguson's duplicative aggravating circumstances argument must fail.

Ferguson makes several arguments in support of construing the Delaware statute as a weighing statute. He first contends that notwithstanding our opinion in Flamer the 1991 amendments transformed the statute into a weighing statute. See br. at 36. However, as the state notes, the 1991 amendments did not alter the relevant provisions regarding what is to be considered during the selection stage in a capital case. While the amendments did change the functions of the jury and the court in the sentencing process, making the court the ultimate decisionmaker, this modification made the sentencing scheme consistent with the one at issue in Zant and did not change Delaware to a "weighing" state. Because the Delaware statute has not

_____

8. Rehearing was denied in McCullah but the opinion on rehearing is not germane to the point involved here. See 87 F.3d 1136 (10th Cir. 1996).

been amended in any significant way relevant to the duplicative factors issue, we are bound by our persuasive opinion in Flamer, which concluded that the Delaware sentencing statute is not a "weighing statute." See Flamer, 68 F.3d at 749. Indeed, Flamer recognized that the 1991 amendments were, with respect to the weighing issue, "substantially the same" as earlier law. See id. at 740 n.1. Thus, in light of Zant Ferguson's duplicative aggravating circumstances argument must fail even if the robbery and pecuniary gain aggravators are singular in character.

We recognize that Ferguson argues further that the effect of the jury charge and the special interrogatory submitted to it was to transform the statute as applied into a "weighing" sentencing scheme by leading the jury to believe that it was required to rely on statutory aggravating factors in recommending a sentence. See br. at 39–41. We rejected a similar argument in Flamer even though the special interrogatory in that case arguably could have suggested to the jury that it could not impose the death sentence at the selection stage unless it relied on a statutory aggravating circumstance.

In this case Ferguson's argument is weaker on this transformation point because the interrogatory submitted to the jury at his trial was not ambiguous in this respect as it provided as follows:

> #1 Do you find the following statutory aggravating circumstance has been proven to exist beyond a reasonable doubt? . . .
>
> #2 Do you find by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist?

App. at 120–21. Moreover, the interrogatory did not ask the jury, as was the case in Flamer, see 68 F.3d at 751, to specify the specific statutory aggravating circumstances on which it relied, if any, during the selection stage.

38

Furthermore, the court specifically instructed the jury that it was not limited to consideration of the statutory aggravating circumstances:

> Delaware law specifies certain statutory aggravating circumstances which the State may contend exist in a particular case. The law does not specify, define, or otherwise identify what constitutes a mitigating circumstance, but the defendant may offer evidence relating to any mitigating circumstance which it contends exists in a particular case. The State may likewise offer evidence as to matters in aggravation in addition to any statutory aggravating circumstances they seek to prove.
>
> An aggravating circumstance is a factor which tends to make the defendant's conduct more serious or imposition of a penalty of death more appropriate.
>
> . . .
>
> After you have decided whether one or more statutory aggravating circumstances exists, you must then weigh and consider the mitigating circumstances and the aggravating circumstances including, but not limited to, the statutory aggravating circumstance or circumstances that you may have already found to exist.

App. at 113-16.

Thus, while court clearly instructed the jury to consider the statutory aggravating circumstances, the court did not give the jury the impression that it could not impose the death penalty unless it relied on one of these factors. Furthermore, the prosecutor argued at length to the jury regarding the presence of nonstatutory aggravating factors and Ferguson's attorney and Ferguson personally argued to the jury that it should take into account numerous mitigating circumstances. Accordingly, the interrogatory did not convert the selection stage at Ferguson's trial into a weighing process in a Clemons sense.[9]

_____

9. We note that in making its decision the court at Ferguson's trial specifically relied in part on aggravating circumstances that were not included in the three factors the jury found.

Ferguson nevertheless suggests that consideration by the jury of any statutory aggravating circumstances during the selection stage transforms the statute into a weighing scheme. See br. at 38-39. To support this argument, Ferguson focuses on the dissent's reasoning in Flamer; however, the majority in Flamer rejected this contention. See Flamer, 68 F.3d at 749. Moreover, the Supreme Court noted that the statutory scheme in Zant, which was a non-weighing statute, did not "place particular emphasis on the role of statutory aggravating circumstances" during the selection stage. Zant, 462 U.S. at 889, 103 S.Ct. at 2749. The Court did not indicate that any consideration would have transformed the statute into a weighing scheme. Indeed, the Court's opinion presupposes that consideration of all aggravating circumstances at the selection stage includes those enumerated by statute. Likewise, in Delaware, the jury is instructed to consider all aggravating circumstances, and is not instructed to place particular emphasis on the statutory factors.

As Ferguson concedes, in reviewing a non-weighing statute, this court may uphold a death verdict where the jury considered an invalid statutory aggravating factor, br. at 36, if the jury also found a valid statutory factor. Of course, here we know that the jury found at least two valid statutory factors. Furthermore, while the Supreme Court held in Zant that merely labeling an aggravating circumstance as "statutory" may cause a jury to give somewhat greater weight to that factor during the selection stage than otherwise would be the case, it recognized that that circumstance may have an "inconsequential" impact on the verdict. Id. at 888-89, 103 S.Ct. at 2749. As we previously noted, the instructions did not suggest to the jury that it should place any greater emphasis on the statutory aggravating circumstances during the selection stage.

Moreover, unlike the situation in Zant and Flamer where the aggravating circumstances were invalid because they were too vague to channel a sentencer's discretion in a capital case, the challenge here is that the jury was permitted to consider the same factor twice. Yet the court obviously mitigated the effect of that double consideration

40

because it instructed the jury that "[i]n weighing the aggravating and mitigating circumstances, it is not a question of mere numbers of each, but rather the relative weight of each as compared to the others." App. at 116. Thus, this was not a case in which the jury could have made its recommendation merely because it determined that there were three rather than two aggravating factors. Accordingly, it is perfectly clear that consideration of both the robbery and pecuniary gain factors did not result in an arbitrary or capricious imposition of the death penalty. Overall, we cannot possibly find an Eighth Amendment duplicative aggravating circumstances violation here even though our determination of the issue is predicated on our exercise of independent judgment.

Finally, we point out that it is highly significant that the jury's finding was only a recommendation that the court was obliged to consider but ultimately could reject. As we previously explained, the court regarded the robbery and pecuniary gain aggravators as one factor. In the circumstances, we conclude that Ferguson was not prejudiced by the jury's finding that the two factors were separate. After all, the jury's consideration of the factors as discrete could have made a difference in the sentence imposed only if the jury would have recommended a sentence of life imprisonment if it considered the robbery and pecuniary gain factors as singular, and the court would have followed its recommendation. We think that such a scenario is far-fetched in view of the court's findings. Accordingly, even if there was error in the jury considering the pecuniary gain and robbery factors as separate aggravating factors, the error was harmless under any standard against which it could be considered no matter how exacting.

In recognition that the Delaware Supreme Court considered Ferguson's duplicative aggravating circumstances claim on a plain error basis, see Ferguson, 642 A.2d 781, the final issue we directed the parties to address in the certificate of appealability related to the possibility of there being an independent and adequate state ground barring federal review because of a procedural default in the state courts. Our disposition on the merits of

41

the duplicative aggravating circumstances claim makes it unnecessary for us to consider the procedural default issue, particularly inasmuch as the Delaware Supreme Court, in rejecting the duplicative aggravating circumstances claim on the merits, did not suggest that its result might have been different if it did not regard the matter as being before it on a plain error basis. See Ferguson, 642 A.2d at 781-83. Thus, although 28 U.S.C. S 2254(b)(2), which provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State," is not in terms applicable to procedural defaults we see no reason why we should not act consistently with that section when there is a possible procedural default. Of course, the procedural default issue differs from the exhaustion of state remedies issue which, notwithstanding 28 U.S.C. S 2254(b)(2), we examined because we needed to parse the Delaware Supreme Court's opinion in Ferguson to determine the effect of the AEDPA in this case.

## III. CONCLUSION

For the foregoing reasons, the order of the district court of December 13, 1996, denying habeas corpus relief will be affirmed.

42

McKEE, Circuit Judge, concurring.

I agree that Ferguson's claims must fail under AEDPA's deferential standard of review, and I therefore concur in the court's judgment. I write separately, however, because I disagree with several of the observations expressed in the majority opinion.

Our review here is narrowly confined by 28 U.S.C. S 2254(d)(1). Affording the deference required by that statute, I agree that the Delaware courts decided Ferguson's ex post facto claim in a manner that is neither "contrary to," nor "an unreasonable application of," the analysis required under the Supreme Court case law discussed in section II B of the majority opinion. See Maj. Op. at 13-27.1 However, my colleagues do not stop there. Rather, they opine: "we would have reached the result we do even if we exercised independent judgment in the way required before the adoption of the AEDPA." Maj. Op. at 32. That statement is, of course, pure dictum, and I strongly disagree with it.

This case is governed by AEDPA, and there is no reason to hypothesize a de novo review of Ferguson's ex post facto claim. Furthermore, I do not agree that Ferguson's claim would necessarily fail if we were permitted to afford it independent review. At the very least, resolution of Ferguson's ex post facto claim presents an issue over which reasonable minds can differ, and therefore resolution of the issue is not nearly as clear as the majority suggests. Indeed, it is solely because "reasonable" minds can differ on this very close call that Ferguson's claim fails on habeas review of the state court ruling. Under AEDPA, we must defer to "reasonable" state court decisions even though, in our independent judgment, they are wrong. "Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law as determined by the Supreme Court

_____

1. I agree with my colleagues that the Supreme Court's most recent case of Carmwell v. Texas, 2000 WL 504585 (U.S. May 1, 2000), is not implicated here given the arguments that Ferguson is making in his appeal. See Maj. Op. at 24-25.

43

of the United States that prevails." Williams v. Taylor, ___
U.S. ___, ___ S.Ct. ___, 2000 WL 385369, *24 (U.S. Apr. 18,
2000) (internal quotation marks omitted). This analytical
paradox is endemic to an analysis under AEDPA, but the
key to resolving it here is the deference that the Supreme
Court has instructed us to afford the decision of the
Delaware Supreme Court.2

In Williams , the Supreme Court confronted the enigmatic
language of S 2254(d)(1). Writing for the majority, Justice
O'Connor amplified the meaning of AEDPA's requirement
that a state court decision be "contrary to," or involve "an
unreasonable application of, clearly established Federal
law, as determined by the Supreme Court of the United
States." The "contrary to" clause, the Court explained,
permits a federal habeas court to grant relief for a
constitutional violation in two scenarios: (1) when"the state
court applies a rule that contradicts the governing law set
forth in [Supreme Court] cases"; or (2) when "the state
court confronts a set of facts that are materially
indistinguishable from a decision of [the Supreme] Court
and nevertheless arrives at a result different from[Supreme
Court] precedent." Id. at *24. "[I]n either of these two
scenarios, a federal court will be unconstrained by
S 2254(d)(1) because the state-court decision falls within
that provision's `contrary to' clause." Id. The Court
cautioned, however, that "a run-of-the-mill state-court
decision applying the correct legal rule from [Supreme

_____

2. The tension inherent in this paradox is illustrated in the Court's
observation that:

    When federal judges exercise their federal-question jurisdiction
    under the judicial power of Article III of the Constitution, it is
    emphatically the province and duty of those judges to say what the
    law is. At the core of this power is the federal courts'
independent
    responsibility -- independent from its coequal branches in the
    Federal Government, and independent from the separate authority
    of the several states -- to interpret federal law. A construction
of
    AEDPA that would require the federal courts to cede this authority
    to the courts of the States would be inconsistent with the practice
    that federal judges have traditionally followed in discharging
their
    duties under Article III of the Constitution.

Williams, 2000 WL 385369, at *9 (Stevens, J., dissenting).

44

Court] cases to the facts of a prisoner's case would not fit comfortably within S 2254(d)(1)'s `contrary to' clause." Id. The Court cited as an example a case in which a state court properly considered an ineffective assistance of counsel claim under the controlling precedent of Strickland v. Washington, explaining that, "[a]lthough the state-court decision may be contrary to the federal court's conception of how Strickland ought to be applied in that particular case, the decision is not `mutually opposed' to Strickland itself." Id. The Court noted that such cases are more appropriately reviewed solely for their "reasonableness." I believe that best describes our situation here, and we should therefore focus our inquiry on the reasonableness of the Delaware Supreme Court's decision.3

The "unreasonable application" clause of S 2254(d)(1) likewise covers two scenarios: (1) when "the state court identifies the correct governing legal rule from[Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case"; or (2) when"the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at *25. This "reasonableness" inquiry is an "objective" one. See id. at *26. "[T]he most important point is that an unreasonable application of federal law is different from an incorrect application of federal law." Id. at *27. Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. However, the Court did not define the mercurial line that divides an "incorrect" from an "unreasonable" application of federal law. Rather, it simply noted that "an unreasonable application of federal law is different from an incorrect or erroneous application of federal law." Id.

_____

3. However, this is not to suggest that an inquiry under either clause of AEDPA necessarily displaces an inquiry under the concomitant clause. We will often have to examine a state court decision under both clauses of AEDPA.

45

Applying the Williams framework here, the majority properly rejects Ferguson's ex post facto claim. The Delaware Supreme Court identified the relevant Supreme Court precedents, and it decided the merits of Ferguson's claim in a manner that was neither "mutually opposed" to those precedents, nor "unreasonable" in its application of them. However, this does not mean that the state court was correct in its application of federal law.

The Delaware Supreme Court held that,

> [g]iven the teaching in Dobbert, it is clear that the changes effected by Delaware's new death penalty statute are procedural. The revisions in the law, like those in Dobbert, merely altered the method of determining imposition of the death penalty. The quantum of punishment for the crime of first-degree murder in Delaware remains unchanged.

Cohen, 604 A.2d at 853. The simplicity of that analysis is misleading, and it produces a conclusion that is incorrect, though not necessarily unreasonable. To be sure, Delaware's law "merely altered the methods employed in determining the punishment to be imposed" insofar as it reassigned the task of imposing sentence from the jury to the judge. But unlike the statute in Dobbert, Delaware's law so conflates procedure and substance that it obfuscates the distinction between the two.

Under the new law, if a judge determines that aggravating factors outweigh mitigating factors, he or she must impose the death penalty. The new procedure, therefore, mandates a substantively different outcome--the death sentence rather than life without parole -- when aggravating factors outweigh mitigating factors. One no longer has the discretion to impose life imprisonment when the aggravators weigh more heavily in the balance. Delaware therefore converted what had been only a discretionary maximum into a mandatory sentence when the aggravating factors outweigh any mitigating factors. As the majority quite correctly notes, the trial judge here observed at sentencing:

> [U]nlike a jury under the old law, this Court, under the new law, may consider only whether or not aggravating

46

> factors outweigh mitigating factors. The Court may not
> in unfettered discretion refuse to impose a sentence of
> death where aggravating factors are proven and found
> to be of substantial weight and mitigating factors are
> found to be of less weight. The Court may not consider,
> in reaching its decision, mercy, societal concerns,
> proportionality of the sentence to other sentences
> imposed for Murder First Degree in other cases, or any
> other issues not specifically pertaining to `the
> particular circumstances or details of the offense[or]
> . . . the character and propensities of the offender. . . .'
> These factors most likely were considered by and may
> have influenced the jury or individual jury members in
> their decision under the prior statute to recommend or
> fail to recommend death. Under that law, the jury
> clearly acted as `the conscience of the community' and
> could in its unfettered discretion recommend life as the
> appropriate punishment for the crime and offender
> even though it had found the aggravating factors to
> outweigh the mitigating factors.

Maj. Op. at 7 (quoting App. at 129-130).

Thus, the "procedural change" wrought by the new law
precludes a juror from exercising mercy in a given case,
and mutes "the conscience of the community" in
deliberations into whether a member of that community
should be put to death. It is misleading to characterize
such a fundamental change in the law as merely
"procedural." I read Lindsey v. Washington  to stand for the
proposition that such a change may well have increased the
quantum of punishment for Ferguson's crime.

The Delaware courts sought to distinguish Lindsey by
citing the Supreme Court's Eighth Amendment
jurisprudence and holding that the new law is not
"impermissibly mandatory." See Cohen, 604 A.2d at 855.
But clearly, a determination that the new law is not
"impermissibly mandatory" sidesteps the crucial question
whether the new law "increased the quantum of
punishment" for Ferguson's offense. The change in
Delaware's law could not have eliminated discretion without
violating the Eighth Amendment. See Furman v. Georgia,
408 U.S. 238 (1972). Thus, even if we assume that

Delaware's new law passes muster under the Eighth Amendment because it affords an individualized inquiry before sentence is imposed, that does not mean that retrospective application of that law to Ferguson's case did not make the death sentence "mandatory" by eliminating the discretion to impose a life sentence after it was determined that the aggravating circumstances outweighed mitigating circumstances.

The Delaware Supreme Court also sought to distinguish Lindsey by ruling that a death sentence is not truly "mandatory" because the judge must assign a "relative weight" to the aggravating and mitigating factors before determining which sentence--life imprisonment or death-- is required by the new statute. The state court concluded that, given the presence of this "weighing process," "[t]he sentencing process remains basically discretionary, merely shifting the ultimate decision from the jury to the trial judge." Cohen, 604 A.2d at 855. The District Court agreed, stating that "[t]he sentencing decision has not been reduced to a mechanical exercise, as it was in Lindsey ." This "distinction" is irrelevant.

While the new law required a "predicate" assessment of the relative weight of the sentencing evidence before the mandated sentence was imposed, that did not make the imposition of this death sentence any less mechanical. As noted, to survive scrutiny under the Eighth Amendment, Delaware must allow for individualized findings of fact before the death sentence is imposed. See, e.g., Blystone, 494 U.S. at 305. Thus, it is specious to distinguish Lindsey by asserting that, because the new law did not require imposition of a death sentence at the very moment Ferguson was convicted, the law somehow lost its "mandatory" and "mechanical" nature. In the context of capital punishment jurisprudence, it clearly did not. Rather, the Delaware law is the capital sentencing equivalent of the law deemed ex post facto in Lindsey. The dispositive issue in Lindsey was that a previously optional maximum became mandatory, not the procedural context in which that metamorphosis occurred. Thus, the state court's reliance upon what it perceived to be the difference between the statute in Lindsey ("the penalty for this offense

48

shall be fifteen years in prison") and the statute here ("if, at sentencing, the judge finds that the aggravating factors outweigh the mitigating factors, the sentence shall be death") does not further the inquiry. "Subtle ex post facto violations are no more permissible than overt ones." Collins, 497 U.S. at 46.

It is also obvious that Delaware's new law had exactly the intended result. Delaware enacted the new sentencing scheme to make it more difficult for convicted murderers to escape execution. The Delaware Supreme Court has noted that

> the catalyst for the legislation changing the death penalty statute was the imposition of life sentences on defendants by a New Castle County jury in a much publicized capital murder case involving the execution style murders of two armored car guards.

Cohen, 604 A.2d at 849. The reaction reflected the community's justifiable outrage over those murders. Ferguson contends that a vastly higher proportion of defendants have been sentenced to death under the new statute. He argues, therefore, that Lindsey prevents Delaware from applying the new statute to him. He asserts that of the 28 defendants who have been sentenced under the amended statute, 15 (more than 50%) have been sentenced to death. Of the 29 defendants sentenced under the old statute in the 6 years prior to the amendment, only 1 (less than 4%) was sentenced to death.[4]

The majority minimizes this argument in part by noting:

> we must consider the increased imposition of the death penalty against the circumstance that under the amended law the court as opposed to a unanimous jury must determine to impose a death penalty. Surely it would be expected that, in light of that difference, there would have been more sentences of death.

Maj. Op. at 33 (emphasis added). The majority cites no authority for this speculation, and I submit that it is at

_____

4. The state disputes this latter figure, stating that 10 defendants were sentenced to death under the previous statute.

49

least as likely (indeed more so) that this change would, by itself, reduce the number of death sentences. After all, one can safely assume that trained jurists are less likely to allow the emotions that so often percolate into the fabric of death penalty proceedings to impact their judgments about the cases that are submitted to death qualified juries. Moreover, there is a significant school of thought that a jury that has been "death qualified" is more prone to convict, and one might argue more prone to impose the death penalty, than a jury composed of persons opposed to the death penalty. See Witt v. Wainwright, 470 U.S. 1039 (1985) (and cases cited therein). Finally, I think it fair to assume that a trained jurist who has been exposed to numerous homicide cases has a better frame of reference than a lay jury, and therefore less likely to be as outraged about a given homicide as lay jurors who have never seen a homicide, or a convicted killer, "up close and personal." Accordingly, the trained jurist may often be far less likely to assume that the ultimate sanction is required in a given case.

I think it is obvious that the new statute is significantly more likely to result in the death penalty than the statute in effect at the time of Ferguson's crime. However, as the majority correctly notes, that does not necessarily implicate the Ex Post Facto Clause. See Collins v. Youngblood, 497 U.S. 37 (1990). However, that clause would be implicated under the aforementioned Lindsey analysis under de novo review, and I believe that Delaware's retrospective application of the challenged statute to Ferguson's case would violate the Ex Post Facto Clause under Lindsey.

That said, I am constrained, nevertheless, to agree with my colleagues that the state court's treatment of Lindsey and the other Supreme Court precedents must be upheld in light of S 2254(d)(1)'s mandate. Under the "contrary to" clause, the Delaware Supreme Court cited and applied the correct law. To paraphrase Williams, while I believe the state court decision does not square with my "conception of how [Lindsey] ought to be applied in th[is] particular case, the decision is not `mutually opposed' to [ Lindsey] itself." Williams, 2000 WL 385369, at *24. Nor is it unreasonable to hold that Delaware's new law limited the factors that

50

could be considered before sentence was imposed upon Ferguson, and still conclude that the law did not eliminate all discretion from the sentencing process. As the majority explains, that is something that Lindsey (and subsequent Supreme Court precedent) can be fairly said to require for a law to contravene the ex post facto prohibition.

Nor can I conclude that the Delaware Supreme Court was "objectively unreasonable" (as opposed to"incorrect") in its application of, or "refusal to extend," clearly established federal law to the facts of Ferguson's case. Thus, while I concur in the Court's judgment, I do so solely because I agree that the result we reach is required under AEDPA.

I also agree that Ferguson's challenge to the duplicative nature of the aggravating factors must fail, but for reasons that I must distinguish from the analysis of my colleagues. I believe Ferguson's "double counting of aggravating factors" claim fails solely because the trial judge in this case stated that he counted the robbery and pecuniary gain circumstances as one factor during the weighing process. The record is clear that the judge placed "no independent weight" on the pecuniary gain aggravator. It was the judge's assessment of the sentencing factors, not the jury's, that sealed Ferguson's fate. Thus, regardless of the merits of Ferguson's Eighth Amendment claim in the abstract, it is clear that the jury's consideration of the two circumstances (though problematic) had no bearing on his sentence, and Ferguson can show no prejudice as a result. Nevertheless, I think Ferguson's argument as to the alleged "double counting" is much stronger than the majority suggests, and I do not join the majority's lengthy discussion of the merits of this claim. I do, however, join the majority's conclusion that the record does not support the Delaware Supreme Court's resolution of the claim, and the majority's conclusion that Ferguson was not prejudiced by double counting because the sentencing judge didn't double count.

Accordingly, for the reasons set forth above, I concur in the judgment of my colleagues.

51

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit