

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-4-2002

# Chadwick v. Janecka

Precedential or Non-Precedential: Precedential

Docket No. 02-1173

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Chadwick v. Janecka" (2002). *2002 Decisions.* Paper 788.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/788

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed December 4, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1173

H. BEATTY CHADWICK

v.

JAMES JANECKA, WARDEN, DELAWARE COUNTY
PRISON; THE DISTRICT ATTORNEY OF COUNTY OF
DELAWARE; THE ATTORNEY GENERAL OF THE STATE

OF PENNSYLVANIA

v.

BARBARA JEAN CROWTHER CHADWICK,
        (Intervenor in District Court)

BARBARA JEAN CROWTHER CHADWICK,
        Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

District Court Judge: Honorable Norma L. Shapiro
(D.C. No. 00-cv-01130)

Argued: May 24, 2002

Before: ALITO, MCKEE, and WALLACE,* Circuit Ju dges.

(Opinion Filed: December 4, 2002)

_____

* The Honorable J. Clifford Wallace, Senior Judge of the United States
Court of Appeals for the Ninth Circuit, sitting by designation.


        ALBERT MOMJIAN
        NANCY WINKELMAN (Argued)
        KEVIN C. McCULLOUGH
        STEPHEN A. FOGDALL
        Schnader Harrison Segal &
         Lewis, L.L.P.
        1735 Market Street, Suite 3800
        Philadelphia, PA 19103

        Counsel for Appellants

        THOMAS S. NEUBERGER (Argued)
        Thomas S. Neuberger, P.A.

2 East Seventh Street, Suite 302
Wilmington, DE 19801

ANNA M. DURBIN
PETER GOLDBERGER
50 Rittenhouse Place
Ardmore, PA 19003

Co-Counsel for Appellee

D. MICHAEL FISHER
WILLIAM H. RYAN, JR.
ROBERT A. GRACI
AMY ZAPP
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120

Counsel for Amicus Curiae
Pennsylvania Office of Attorney
General

OPINION OF THE COURT

ALITO, Circuit Judge:

This appeal was taken from an order granting a petition for a writ of habeas corpus filed by Mr. H. Beatty Chadwick under 28 U.S.C. S 2254. The petitioner has applied eight times to the courts of Pennsylvania and six times to the federal district court for release from incarceration for civil

2

contempt for refusing to comply with an order in a matrimonial proceeding directing him to pay over $2.5 million into an escrow account. In the present case, the District Court concluded that the petitioner had exhausted state remedies even though he had not applied to the Pennsylvania Supreme Court for review of the adverse decision of the Superior Court. In the view of the District Court, it was sufficient that the petitioner subsequently submitted a habeas petition to the Pennsylvania Supreme Court in its original jurisdiction pursuant to 42 Pa. Cons. Stat. S 721. With respect to the merits of the present proceeding, the District Court accepted the state courts' repeated findings that the petitioner is able to comply with the order directing him to pay the funds into escrow, but the District Court nevertheless held that the length of petitioner's confinement -- then almost seven years -- meant that the contempt order had lost its coercive effect and that confinement for civil contempt was no longer constitutional. On appeal, the petitioner defends that decision of the District Court but does not contest the state courts' findings that he is able to comply with the underlying order but simply refuses to do so. We reverse.

I.

In November 1992, Mrs. Barbara Chadwick filed for divorce in the Delaware County (Pennsylvania) Court of Common Pleas. During an equitable distribution conference in February 1993, Mr. Chadwick informed the state court and Mrs. Chadwick that he had unilaterally transferred $2,502,000.00 of the marital estate to satisfy an alleged debt to Maison Blanche, Ltd., a Gibraltar partnership.

It was later discovered that (1) one of the principals of Maison Blanche had returned $869,106.00 from Gibraltar to an American bank account in Mr. Chadwick's name and that these funds had then been used to purchase three insurance annuity contracts; (2) $995,726.41 had been transferred to a Union Bank account in Switzerland in Mr. Chadwick's name; and (3) $550,000.00 in stock certificates that the petitioner claimed he had transferred to an unknown barrister in England to forward to Maison Blanche had never been received. The state court then

entered a freeze order on the marital assets on April 29, 1994.

In May 1994, Mr. Chadwick redeemed the annuity contracts and deposited the funds in a Panamanian bank. After a hearing on July 22, 1994, the court determined that Mr. Chadwick's transfer of the money was an attempt to defraud Mrs. Chadwick and the court. At that time, the court ordered petitioner to return the $2,502,000.00 to an account under the jurisdiction of the court, to pay $75,000.00 for Mrs. Chadwick's attorney's fees and costs, to surrender his passport, and to remain within the jurisdiction. Mr. Chadwick refused to comply, and Mrs. Chadwick thereafter filed a petition to have him held in civil contempt. Mr. Chadwick failed to appear at any of the three contempt hearings, but his attorney was present. The court found Mr. Chadwick in contempt of the July 22, 1994, order and issued a bench warrant for his arrest.

After learning of the bench warrant, Mr. Chadwick fled the jurisdiction but was arrested and detained on April 5, 1995. The state court determined that Mr. Chadwick had the present ability to comply with the terms of the July 22, 1994, order and set bail at $3,000,000. Mr. Chadwick could have been released from custody either by posting bail or by complying with the July 22, 1994, order. To date, he has done neither.

Since his confinement, Mr. Chadwick has applied eight times to the state courts1 and six times to the federal court2

---

1. The state petitions include: (1) an emergency petition for release, which was denied by the Court of Common Pleas and affirmed by the Superior Court; (2) six state habeas petitions, all of which were denied; and (3) a petition for release from imprisonment or, in the alternative, house arrest, which was denied. See Appellant's Br. at 8-12.

2. The federal petitions include: (1) an emergency motion for injunctive relief pursuant to 42 U.S.C. S 1983, which was denied because abstention was appropriate under the doctrine of Younger v. Harris, 401 U.S. 37 (1971); (2) an emergency motion pursuant to 42 U.S.C. S 1983, which was denied, or, in the alternative, habeas corpus under 28 U.S.C. S 2241, which was dismissed for failure to exhaust state remedies; (3) a third federal habeas petition, which was denied for failure to exhaust state remedies; (4) a petition for reconsideration of the dismissal of the

to gain release from incarceration. After the trial court denied his sixth state habeas petition, the Superior Court affirmed the decision on April 23, 1997, stating:

> Instantly, appellant cites to the fact that he has been incarcerated since April 5, 1995. He claims the length of his incarceration, his age, poor health, inability to pursue his career and repeated hearings where he has refused compliance suggests that there is no possibility that he will comply with the order. Appellant admits that no court in this jurisdiction has adopted this test and we will not do so here. While it seems reasonable that at some point a temporal benchmark should be adopted to determine when contempt incarceration becomes impermissibly punitive we think that it is for our high court to make such a determination.

Chadwick v. Janecka, No. 00-CV-1130, 2000 U.S. Dist. LEXIS 21732, at *14-15 (E.D.Pa. Dec. 11, 2000) (internal citation omitted). Despite the Superior Court's invitation that the petitioner ask the Pennsylvania Supreme Court to decide the point at which incarceration for contempt becomes punitive, the petitioner did not file an allocatur petition in the state supreme court.

Later, on July 18, 1997, petitioner filed another petition for federal habeas relief, which was dismissed for failure to exhaust state court remedies. The District Court wrote:

> Although Mr. Chadwick has forfeited his right to seek Supreme Court review of the Superior Court's April 23, 1997 denial of his sixth state habeas petition, see Pa.R.App.P. 1113(a) (petition for allowance of appeal must be filed within 30 days of order), he would not be barred from filing a seventh state habeas petition based on his present confinement of approximately thirty-seven months. Under Pennsylvania law, Mr.

_____

third federal habeas petition, which was also denied for failure to exhaust state remedies; (5) a fourth federal habeas petition, which was also denied for failure to exhaust state remedies; and (6) a fifth federal habeas petition, which is the basis of this appeal. See Appellant's Br. at 12-13.

> Chadwick can file a seventh state habeas petition in the Court of Common Pleas and exhaust his appellate remedies, see 42 Pa.Cons.Stat.Ann. S 931, or petition directly in the Supreme Court, which has original jurisdiction over habeas corpus proceedings. See 42 Pa.Cons.Stat.Ann. S 721(1). But unless the issues presented in the federal habeas petition have all been first presented to the Supreme Court, the district court may not exercise jurisdiction. See Lambert, 134 F.3d at 515 (requiring "complete exhaustion"); Swanger, 750 F.2d at 295 (raising claim before Supreme Court in petition for allowance of appeal satisfies exhaustion requirement).

Chadwick v. Andrews, No. 97-4680, 1998 WL 218026, at *5 (E.D.Pa. April 30, 1998) (emphasis added). Because Mr. Chadwick had not sought review in the Pennsylvania Supreme Court on the issue presented in his federal petition, that petition was dismissed.

In September 1999, Mr. Chadwick filed a pro se Application for Leave to File Original Process (his seventh state habeas action) with the Pennsylvania Supreme Court. Mrs. Chadwick sought permission to intervene, and opposed the application and the state habeas petition. In a per curiam order dated February 8, 2000, the Pennsylvania Supreme Court granted the request to file original process and the request to file an answer, but the court denied the petition for habeas corpus.

On March 2, 2000, Mr. Chadwick filed the instant petition for federal habeas relief. The District Court granted that petition on January 3, 2002, but stayed its order for 30 days to "allow appeal and application for further stay of this court's order to the appellate court." Chadwick v. Janecka, No. 00-1130, 2002 U.S. Dist. LEXIS 10, at *27 (E.D.Pa. Jan.3, 2002). Mrs. Chadwick took this timely appeal. By order dated January 31, 2002, we granted Mrs. Chadwick's motion for a stay pending appeal. The United States Supreme Court thereafter denied Mr. Chadwick's Application for Enlargement and to Vacate Stay.

II.

The first issue we must address is whether Mrs. Chadwick has standing to proceed on appeal. Mr. Chadwick

argues that because Mrs. Chadwick was an intervenor in the District Court, she lacks Article III standing. He further argues that, because the respondents -- the warden, the Delaware County District Attorney, and the Attorney General of the Commonwealth -- did not appeal, we do not have jurisdiction to entertain this appeal.

The United States Supreme Court has stated that"an intervenor's right to continue a suit in the absence of the party on whose side the intervention was permitted is

contingent upon a showing by the intervenor that he fulfills the requirements of Art[icle] III." Diamond v. Charles, 476 U.S. 54, 68 (1986). Under Article III of the United States Constitution, the judicial power extends only to "Cases" and "Controversies." As noted in Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000):

> a plaintiff must meet three requirements in order to establish Article III standing. See, e.g., Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc. , 528 U.S. 167, 180-181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000). First, he must demonstrate "injury in fact" -- a harm that is both "concrete" and "actual or imminent, not conjectural or hypothetical." Whitmore v. Arkansas, 495 U.S. 149, 155, 109 L. Ed. 2d 135, 110 S. Ct. 1717 (1990) (internal quotation marks and citation omitted). Second, he must establish causation -- a "fairly . . . traceable" connection between the alleged injury in fact and the alleged conduct of the defendant. Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41, 48 L. Ed. 2d 450, 96 S. Ct. 1917 (1976). And third, he must demonstrate redressability -- a "substantial likelihood" that the requested relief will remedy the alleged injury in fact. Id.

See also, e.g., Valley Forge Christian College v. Americans United For Separation of Church & State, 454 U.S. 464, 472 (1982); In re Grand Jury, 111 F.3d 1066, 1071 (3d Cir. 1997).

We have little difficulty concluding that Mrs. Chadwick meets all of these requirements here. First, Mrs. Chadwick clearly has suffered and continues to suffer an injury in

7

fact that is both "concrete" and "actual," "not conjectural or hypothetical." Mr. Chadwick has placed a substantial sum of money beyond the reach of the state court before whom the matrimonial case is pending. If the decision of the District Court is affirmed, Mr. Chadwick will be released from jail and will be relieved of the pressure to return this money for equitable distribution. Second, Mrs. Chadwick's injury is unquestionably traceable to Mr. Chadwick's refusal to comply with the state court order under which he is being held. The District Court's order would erase the effect of the state court order requiring the return of the funds and would significantly reduce Mrs. Chadwick's share of the marital estate. Third, Mrs. Chadwick's injury may be redressed by a favorable decision here. A reversal of the District Court's order granting Mr. Chadwick's petition would require him to remain in prison until he returns the $2.5 million to the state court for later distribution.

In arguing that Mrs. Chadwick lacks standing, the petitioner relies principally on Diamond v. Charles, 476 U.S. 54 (1986), but that case is easily distinguishable. The Diamond case involved a constitutional attack on an Illinois

statute restricting abortions. Id. at 56. Diamond, a pediatrician, successfully moved to intervene in the District Court, based on his conscientious objection to abortion and his status as a pediatrician and the father of a minor daughter. Id. at 66. When the District Court permanently enjoined provisions of the statute and the Court of Appeals affirmed, the State of Illinois did not appeal to the Supreme Court, but Diamond did. Id. at 62-63. The Court held that Diamond could not maintain the appeal as the sole appellant because he lacked Article III standing. Id. at 64-71. Noting that Illinois, by not appealing, had accepted the decision that its statute was unconstitutional, the Court observed that even if it upheld the statute, Diamond, a private citizen, could not compel the state to enforce it. Id. at 64-65. In addition, the Court explained, Diamond could not establish that he had or would suffer injury in fact. Id. at 65-71. Diamond argued that if the statute were upheld, there would be fewer abortions and greater demand for his services as a pediatrician, but the Court dismissed this argument as speculative. Id. at 66. The Court likewise rejected Diamond's contention that he had standing

8

because of his interest in the standards of medical practice relating to abortion. Id. at 66-67. The Court stated that Diamond's abstract interest in the issue of abortion could not substitute for the concrete injury demanded by Article III. Id. In response to Diamond's claim of standing as the father of a minor daughter, the Court noted that the validity of the parental notification provision of the statute was not at issue in the appeal and Diamond had not provided factual support to show that the provisions that were at issue threatened him with any concrete injury. Id. at 67. Finally, the Court held that Diamond could not assert any constitutional rights of unborn fetuses and that the award of fees against him in the District Court could not "fairly be traced to the Illinois Abortion Law." Id. at 70.

Other than the fact that Diamond and Mrs. Chadwick are both intervenors, the two cases have little in common. Mrs. Chadwick, as noted, has a direct financial interest: she wants Mr. Chadwick to produce a very substantial sum of money in which she claims a share. By contrast, Diamond's claim that upholding the Illinois law would result in more live births and thus increase his income as a pediatrician was highly speculative and an obvious makeweight. Diamond was a classic case of an attempt to litigate an abstract legal issue; the present case involves a concrete monetary interest.

Mr. Chadwick argues, however, that Mrs. Chadwick has no concrete injury at stake because "even if she were somehow to secure a reversal of the district court's order, the respondents would still be required to release Mr. Chadwick, because they did not appeal." Appellee's Br. at 21. We reject this highly technical argument and find Martin-Trigona v. Shiff, 702 F.2d 380 (2d Cir. 1983), instructive on the question whether someone other than the

legal custodian of a prisoner may appeal an adverse decision in a habeas proceeding. In Martin-Trigona, a bankruptcy judge ordered a debtor imprisoned for civil contempt when he refused to submit to examination by the trustees. Id. at 381. The debtor filed a petition for a writ of habeas corpus, the District Court granted the motion, and the trustees appealed. Id. The Second Circuit held that the trustees were the real parties in interest because"[t]hey

9

ha[d] a legitimate interest in seeing to it that Martin-Trigona testifie[d] to the location of certain assets, books, and records that are necessary to the administration of the estates." Id. at 386. Because the trustees' interests were sufficiently affected by the District Court's order, the Second Circuit held that the trustees had standing to appeal even though they were not the custodian of the debtor. Id.; Cf. United States ex rel. Thom v. Jenkins, 760 F.2d 736 (7th Cir. 1985) (private party who prosecuted contempt proceedings against judgment debtor was respondent and appellee on appeal of debtor's habeas petition following jailing for contempt). Martin-Trigona is analogous to the case at bar because Mrs. Chadwick-- like the trustees -- is the party who has "a legitimate interest in seeing to it," 702 F.2d at 386, that Mr. Chadwick returns a substantial portion of the marital estate to the court. We find the decision in Martin-Trigona to be persuasive.

The only case cited by Mr. Chadwick in support of his position is far afield. In Carter v. Rafferty , 826 F.2d 1299, 1303-04 (3d Cir. 1987), the District Court granted habeas petitions filed by two prisoners who had been tried and convicted together in state court. The habeas respondents appealed, but their notice of appeal "specifically limited itself to the order releasing [one of the prisoners]." Id. at 1303. Noting that what was then Rule 3(c) of the Federal Rules of Appellate Procedure3 required that a notice of appeal "designate the judgment, order, or part thereof appealed from," the Court held that it lacked jurisdiction to consider the portion of the District Court's judgment relating to the other prisoner because the appellants had failed to specify that they were appealing that part of the judgment. Id. at 1304. Thus, Carter does not stand for the proposition that only the person with the keys to the jail has standing to appeal an order granting a writ of habeas corpus. Rather, Carter holds that only the portions of an order specified in a notice of appeal may be challenged in the appeal. We accordingly hold that Mrs. Chadwick has Article III standing to pursue the present appeal. We have considered all of Mr. Chadwick's standing arguments, and we find them to be devoid of merit.

---

3. See current Fed. R. App. Proc. 3(c)(1)(B).

10

III.

Mrs. Chadwick argues that Mr. Chadwick did not exhaust all available state court remedies before presenting his claims to the federal court in his habeas petition. See 28 U.S.C. S 2254(b)(1). Mrs. Chadwick makes two exhaustion arguments. First, she argues that Mr. Chadwick did not fairly present to the Pennsylvania Supreme Court the same claims that he raised in his federal habeas petition. See Picard v. Connor, 404 U.S. 270, 275-76 (1971). Specifically, Mrs. Chadwick urges reversal because the period of confinement listed in Mr. Chadwick's application for leave to file original process before the Pennsylvania Supreme Court -- "over 50 months" (i.e., four years and two months) -- and the period of confinement for which the District Court granted habeas -- "nearly seven years" -- are not the same. Second, Mrs. Chadwick argues that Mr. Chadwick's application for leave to file original process did not fairly present the claims to the Pennsylvania Supreme Court where, although it has original jurisdiction in habeas matters,4 the Pennsylvania Supreme Court will ordinarily refer habeas petitions to the appropriate lower court, unless there exists "imperative necessity or apparent reason why expedition is desirable or required." See Commonwealth ex rel. Paylor v. Claudy, 366 Pa. 282, 287 (1951).

Although Mrs. Chadwick would have us decide the question of exhaustion, we decline to do so here because, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (enacted April 24, 1996), we may deny a habeas petition on the merits even though state remedies may not have been exhausted. See 28 U.S.C. S2254(b)(2); see also Pennsylvania ex rel. Craig v. Maroney, 348 F.2d 22, 33 (3d Cir. 1965); In re Ernst, 294 F.2d 556, 561-62 (3d Cir. 1961).

_____

4. Pennsylvania statutes state that "[t]he Supreme Court shall have original but not exclusive jurisdiction of all cases of . . . Habeas corpus." 42 Pa. Cons. Stat. S 721.

11

IV.

A.

Turning to the merits,5 we must first address the proper scope of review in this case. The parties dispute whether the standard of review set out in 28 U.S.C. S 2254(d) applies here.6

Relying on Everett v. Beard, 290 F.3d 500, 507-08 (3d Cir. 2002); Appel v. Horn, 250 F.3d 203, 209-12 (3d Cir. 2001); and Hameen v. Delaware, 212 F.3d 226, 248 (3d Cir. 2000), Mr. Chadwick argues that 28 U.S.C. S 2254(d) is inapplicable in this case because the "state supreme court, after accepting Mr. Chadwick's original habeas corpus

petition for adjudication on its merits, denied relief without
any statement of reasons at all." Appellee's Br. at 33.
According to Mr. Chadwick, under these circumstances, 28
U.S.C. S 2254(d) "simply does not apply." Appellee's Br. at
33. We reject this argument, which is contrary to Supreme
Court precedent and misinterprets our court's prior
decisions.

Under 28 U.S.C. S 2254(d)(1)(emphasis added), if a state
prisoner's habeas claim "was adjudicated on the merits in
State court proceedings," our standard of review is narrow:
we may not reverse "unless the adjudication of the claim
. . . resulted in a decision that was contrary to, or involved

_____

5. After our decision reversing the decision of the District Court was
filed, Mr. Chadwick filed a petition for rehearing that substantially
elaborated on certain points raised in his original brief, and the panel
received an answer to the petition pursuant to our Internal Operating
Procedure 9.5.2. Both panel rehearing and rehearing en banc have been
denied, but the panel believes that it is appropriate to respond to certain
points addressed in the petition for rehearing. Rather than issuing a
separate opinion sur denial of panel rehearing, this opinion has been
amended in order to integrate that discussion into the related discussion
in the original opinion.

6. We review de novo the District Court's legal conclusions, including its
application of the standards of review imposed by AEDPA. See Banks v.
Horn, 271 F.3d 527, 531 (3d Cir. 2001). If a District Court has a proper
occasion to make findings of fact, they are reviewed for clear error. See
Love v. Morton, 112 F.3d 131, 133 (3d Cir. 1997).

an unreasonable application of, clearly established Federal
Law . . . ." In Hameen, we held that the petitioner had
properly exhausted the claim that his Eighth Amendment
rights had been violated because two of the aggravating
circumstances found to support the death penalty were
duplicative. 212 F.3d at 246-47. We concluded, however,
that the Delaware Supreme Court "did not pass on[the
petitioner's] Eighth Amendment constitutional duplicative
aggravating circumstances argument, even though it had
the opportunity to do so." Id. at 248. Accordingly, the
Hameen panel held that this claim had not been
"adjudicated on the merits in State court proceedings" and
that the restrictive standard of review in 28 U.S.C.
S 2254(d)(1) did not apply. 212 F.3d at 248.

Appel followed Hameen, stating that"when, although
properly preserved by the defendant, the state court has
not reached the merits of a claim thereafter presented to a
federal habeas court, the deferential standards provided by
AEDPA . . . do not apply." 250 F.3d at 210. The Appel panel
held that the petitioner had properly presented in the state
courts a claim of the constructive denial of counsel but that
the state courts had misconstrued the claim as one of the
ineffective assistance of counsel. Id. at 210-12. Observing
that "[t]he two claims, of course, are different," id. at 210,

the panel held that the constructive denial claim had not been decided by the state courts and that the restrictive standards of S 2254(d) did not apply. Id . at 211.

Finally, the Everett court, relying on Hameen, 290 F.3d at 508, held that the S 2254(d) standards did not apply because the state courts had not adjudicated the petitioner's properly exhausted claim that his Sixth Amendment right to the effective assistance of counsel had been violated but instead had decided only that his rights under state law had not been abridged. See id . at 516.

Hameen, Appel, and Everett stand for the proposition that, if an examination of the opinions of the state courts shows that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply. Hameen, Appel, and Everett did not deal with

13

summary dispositions -- but Weeks v. Angelone , 528 U.S. 225 (2000), did.

In Weeks, the petitioner "presented 47 assignments of error in his direct appeal to the Virginia Supreme Court." 528 U.S. at 231. The state supreme court rejected number 44 without explanation. Reviewing this claim, the Fourth Circuit recognized that the AEDPA standards do not apply when a state court has not adjudicated a claim on the merits, Weeks v. Angelone, 176 F.3d 249, 258 (4th Cir. 1999), but the Fourth Circuit held that "[w]here, as here, the state supreme court has adjudicated a claim on the merits but has given no indication of how it reached its decision, a federal habeas court must still apply the AEDPA standards of review." Id. at 259. Applying those standards, the Fourth Circuit denied the application for a certificate and dismissed the habeas petition.

The United States Supreme Court reviewed the claim set out in assignment of error 44 and affirmed. See 528 U.S. at 231. After explaining why there had been no constitutional violation, the Court wrote:

> Because petitioner seeks a federal writ of habeas corpus from a state sentence, we must determine whether 28 U.S.C. S 2254(d) precludes such relief. The Court of Appeals below held that it did. 176 F.3d, at 261. We agree. Section 2254(d) prohibits federal habeas relief on any claim "adjudicated on the merits in State court proceedings," unless that adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. SS 2254(d) and (1) (1994 ed., Supp. III). For the reasons stated above, it follows a fortiori that the adjudication of the Supreme Court of Virginia affirming petitioner's conviction and sentence neither was "contrary to," nor did it involve an

"unreasonable application of," any of our decisions.

528 U.S. at 237. Thus, the Supreme Court clearly held that the S 2254(d) standards apply when a state supreme court rejects a claim without giving any "indication of how it reached its decision." 176 F.3d at 259.

14

Needless to say, if Hameen, Appel, and Everett conflict with Weeks, the former must give way, but we see no such conflict. Hameen, Appel, and Everett govern when the opinion of a state court reveals that it did not adjudicate a claim; Weeks applies when a claim is rejected without explanation. In the present case, the Pennsylvania Supreme Court rejected Chadwick's claim on the merits without explanation. Weeks is therefore the governing precedent, and S 2254(d) must be applied.

B.

Under 28 U.S.C. S 2254(d), a federal court may grant habeas relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," id. S 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. S 2254(d)(2).[7] Moreover, a state court's factual findings are "presumed to be correct," and the habeas petitioner carries the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. S 2254(e)(1).

In Williams v. Taylor, 529 U.S. 362, 405-06 (2000), Justice O'Connor wrote in her controlling opinion that a state court ruling is "contrary to" clearly established Supreme Court precedent for the purposes of S 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." A state court decision is an "unreasonable application"[8] of Supreme Court precedent if it "identifies the

_____

7. The District Court agreed with all of the factual findings of the state courts, stating that "[t]he record below clearly demonstrates that the state court findings were not erroneous. This court is convinced that Mr. Chadwick has the present ability to comply with the July 22, 1994 order." Chadwick v. Janecka, No. 00-1130, 2002 U.S. Dist. LEXIS 10, at *19 (E.D.Pa. Jan. 3, 2002). Therefore, no S 2254(d)(2) inquiry is necessary here.
8. It has been argued that a state court may unreasonably apply clearly established Supreme Court precedent by unreasonably refusing to

15

correct governing legal rule from [the Supreme] Court's cases, but unreasonably applies it to the facts of the particular state prisoner's case." Williams v. Taylor, 529 U.S. 362, 407 (2000) (O'Connor, J., concurring) (controlling opinion). When making the "unreasonable application" inquiry, the federal habeas court should ask "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409 (emphasis added); see also Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999) (en banc) (stating the test to be "whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified [under existing Supreme Court precedent]") (emphasis added).

In urging this Court to affirm the District Court's decision, Mr. Chadwick argues that the state courts failed to recognize that his confinement has ceased to be coercive and that, as a consequence, he cannot be held in custody any longer unless he is convicted and sentenced for criminal contempt. We disagree and hold that the state courts' decision -- denying habeas relief because Mr. Chadwick has the present ability to comply with the court order -- was neither contrary to nor an unreasonable application of "clearly established Federal Law, as determined by the Supreme Court of the United States." 28 U.S.C. S 2254(d)(1).

1.

To determine whether a contempt order is civil or criminal, Supreme Court jurisprudence requires an examination of the "character and purpose" of the sanction imposed. See International Union v. Bagwell, 512 U.S. 821,

---

extend a legal principle to a new context. Ramdass v. Angelone, 530 U.S. 156, 165 (2000); Williams v. Taylor, 529 U.S. 362, 408 (2000); Marshall v. Hendricks, 307 F.3d 36, 51 n.2 (3d Cir. 2002). For present purposes, we assume the validity of this subset of the concept of unreasonable application. In discussing the concept of unreasonable applications in this opinion, we intend our remarks to refer to all types of unreasonable application, including the unreasonable failure to extend.

16

827 (1994); Gompers v. Buck's Stove & Range Co. , 221 U.S. 418, 441 (1911). Civil confinement "is remedial, and for the benefit of the complainant," Gompers, 221 U.S. at 441, whereas criminal confinement "is punitive, to vindicate the authority of the court." Id. The Bagwell Court identified the "paradigmatic coercive, civil contempt sanction" as

> involv[ing] [the] confin[ement][of] a contemnor
> indefinitely until he complies with an affirmative
> command such as an order "to pay alimony, or to
> surrender property ordered to be turned over to a
> receiver, or to make a conveyance." 221 U.S. at 442
> . . . . In these circumstances, the contemnor is able to

> purge the contempt and obtain his release by
> committing an affirmative act, and thus " 'carries the
> keys of his prison in his own pocket.' " Gompers, 221
> U.S. at 442.

512 U.S. at 828 (emphasis added) (citations omitted).
Conversely, the Bagwell Court observed,"a fixed sentence
of imprisonment is punitive and criminal if it is imposed
retrospectively for a 'completed act of disobedience,' such
that the contemnor cannot avoid or abbreviate the
confinement through later compliance." Id. at 828-29
(citations omitted). Thus, Bagwell seems to permit a
contemnor who has the ability to comply with the
underlying court order to be confined until he or she
complies, and if this reading is correct, Bagwell directly
contradicts the decision of the District Court in the present
case.

Mr. Chadwick, however, urges us not to take Bagwell at
face value. He contends that the phrase "indefinitely until
he complies" in Bagwell does not mean"permanently and
without other recourse." Pet. for Rehearing at 4. Instead, he
maintains that "[t]he word 'indefinitely' is apparently used
in its most precise sense, to mean 'with no pre-determined
ending date' . . . ." Pet. for Rehearing at 4 n.4. We have no
quarrel with this definition, but this understanding of the
term "indefinitely" does not explain away the critical
statement in Bagwell that a civil contemnor may be
confined "indefinitely until he complies." 512 U.S. at 828
(emphasis added).

17

The meaning of the statement in Bagwell that a
contemnor may be held "indefinitely until he complies" is
perfectly clear. The phrase "until he complies" sets the
point in time when confinement must cease. The term
"indefinitely" describes the length of confinement up to that
point, namely, a period "having no exact limits," WEBSTER'S
THIRD NEW INTERNATIONAL DICTIONARY 1147 (1971), because the
end point (the time of compliance) cannot be foretold. Mr.
Chadwick's contrary interpretation -- that "indefinitely
until he complies" means "indefinitely until he complies or
it becomes apparent that he is never going to comply" -- is
insupportable. And even if that were a reasonable
interpretation, the petition would still lack merit because in
order to win it is not enough for Mr. Chadwick to show that
his reading is reasonable; he must show that his reading is
"clearly established" in Supreme Court precedent. 28 U.S.C.
S 2254(d)(1).

In an effort to show that his position is "clearly
established" in Supreme Court case law, Mr. Chadwick
turns to Maggio v. Zeitz, 333 U.S. 56 (1948), which he
interprets to mean that a civil contemnor who is able to
comply with the underlying court order but simply will not
do so must eventually be released. In making this
argument, Mr. Chadwick relies almost entirely on two
sentences in the Maggio opinion, but when that opinion is

read in its entirety and with the context of the case in mind, it is apparent that the opinion does not support Mr. Chadwick's position. As we will explain, Maggio focuses on the question of ability to comply, not willingness to comply -- and Mr. Chadwick's ability to comply has not been challenged in the present proceeding and is not at issue.

Maggio is a procedurally complicated case, 9 but for

_____

9. Maggio was the principal of a bankrupt camera shop. 333 U.S. at 58. The bankruptcy trustee asked the referee to order Maggio to turn over cameras and camera equipment that he had allegedly taken from the business. Id.; In re Luna Camera Services, 157 F.2d 951, 953 (2d Cir. 1946). To obtain such an order, the trustee was supposed to prove by clear and convincing evidence that Maggio had wrongfully taken the property and still possessed it. In re Luna Camera Services, 157 F.2d at 953. However, under Second Circuit precedent, once a wrongful taking

18

present purposes, it is enough to note that Maggio was the principal of a bankrupt company; that he was jailed for civil contempt for failing to comply with a "turnover order" directing him to return property that he had wrongfully taken from the debtor; and that the Second Circuit affirmed the order of contempt -- even though there was no evidence in the record that Maggio still possessed the property and was thus able to return it and even though the Second Circuit panel expressed the view that Maggio clearly did not have the property and could not comply. Central to the Second Circuit's holding was its interpretation of certain statements in Oriel v. Russell, 278 U.S. 358 (1929), to mean that Maggio's continued possession of the property had to be viewed as established as a matter of law irrespective of whether he actually still had the property. See 333 U.S. at 71.

_____

was shown, continued possession at the time when the turnover order was sought was presumed unless the subject of the requested order proved the contrary. Id. In Maggio's case, the trustee offered no evidence of Maggio's continued possession, but the referee found that Maggio still possessed the property based solely on the presumption. The trustee thus ordered Maggio to turn over the property, and both the District Court and the Second Circuit affirmed. See 333 U.S. at 59. When Maggio failed to comply with this order, the referee found him in contempt, and the District Court affirmed and ordered him jailed until he complied. Id.

On appeal, the Second Circuit panel disagreed with Second Circuit precedent under which continued possession was presumed unless disproved. See 157 F.2d at 953. The panel expressed the view that the presumption was contrary to common sense in some instances and that Maggio no longer possessed the cameras and equipment. Id. at 953.

The panel, however, felt bound by circuit precedent to accept the presumption. The panel noted that the finding in the litigation regarding the turnover order that Maggio still possessed the property at the time of that order (in 1943) was res judicata. 157 F.2d at 954. Furthermore,

the panel interpreted the Supreme Court's decision in Oriel v. Russell, 278 U.S. 358 (1929), to mean that it was also necessary to accept the fact that Maggio still possessed the property at the time of the order of contempt (in 1945). See 157 F.2d at 954. The panel thus affirmed the order of contempt, but it explicitly invited the Supreme Court to grant certiorari and wipe out the objectionable circuit precedent regarding the presumption of continued possession. See id. at 955. The Supreme Court obliged.

The Supreme Court reversed the Second Circuit and remanded the case to the District Court for the purpose of receiving evidence and making a finding on the question whether Maggio was able to comply with the turnover order. The entire focus of the opinion was on the issue of ability to comply. In part I of its opinion, the Court held that a turnover order should not be issued unless the person in question has the present ability to comply. 333 U.S. at 61-64.[10] In part II, the Court discussed the ways in which a bankruptcy trustee may prove continued possession and present ability to comply. Id. at 64-67. The Court agreed that present possession may sometimes be inferred from past possession, but the Court counseled that close attention should be paid to the particular circumstances of the case. Id.

After discussing other aspects of civil contempt law in part III of its opinion,[11] the Court explained in part IV that a bankrupt may not be jailed for refusal to perform "an impossibility." 333 U.S. at 69. The Court disagreed with the Second Circuit that Oriel compelled the courts to proceed on the assumption that Maggio continued to possess the property at the time of the order of contempt. The Maggio Court noted that Oriel had quoted the following statement from a lower court opinion:

> " 'Where [confinement for civil contempt] has failed [to produce compliance], and where a reasonable interval of time has supplied the previous defect in the evidence, and has made sufficiently certain what was doubtful before, namely, the bankrupt's inability to obey the order, he has always been released, and I need hardly say that he would always have the right to be released, as soon as the fact becomes clear that he can not obey.' "

---

10. Court stated: "The nature and derivation of the remedy make clear that it is appropriate only when the evidence satisfactorily establishes the existence of the property or its proceeds, and possession thereof by the defendant at the time of the proceeding." 333 U.S. at 63-64.

11. The Court reaffirmed that a person held in civil contempt cannot attack the validity of the underlying order with which the person has not complied. 333 U.S. at 67-69.

333 U.S. at 72 (emphasis added) (quoting Oriel , 278 U.S. at 366 (quoting In re Epstein, 206 F. 568, 570 (E.D. Pa. 1913)). The Court continued that "the authorities relied upon" in Oriel made it clear that the"decision did not contemplate that a coercive contempt order should issue when it appears that there is at that time no willful disobedience but only an incapacity to comply ." Id. at 72-73.12

Addressing Maggio's situation, the Court concluded that Maggio's possession of the property at the time of the turnover order created a prima facie case of his ability to comply at the time of the civil contempt, and the Court stated that he could "successfully meet" this prima facie case "only with a showing of present inability to comply." Id. at 75. The Court continued:

> Of course, if he offers no evidence as to his inability to comply with the turnover order, or stands mute, he does not meet the issue. Nor does he do so by evidence or by his own denials which the court finds incredible in context.

Id. at 76-77. Then, in the passage on which Mr. Chadwick relies, the Court added:

> [T]he bankrupt may be permitted to deny his present possession and to give any evidence of present conditions or intervening events which corroborate him. The credibility of his denial is to be weighed in the light of his present circumstances. It is everywhere admitted that even if he is committed, he will not be held in jail forever if he does not comply. His denial of

---

12. In two lengthy footnotes, the Maggio Court surveyed the relevant lower court authorities. Id. at 73-74 nn. 6 & 7. In footnote six, the Court examined cases involving turnover orders in bankruptcy and stated that "[t]he cumulative effect of these authorities seems clearly to be that, while a bankrupt's denial of present possession, standing alone, may not be sufficient to establish his inability to produce the property or its proceeds, if the court is satisfied, from all the evidence properly before it, that the bankrupt has not the present ability to comply, the commitment order should not issue." 333 U.S. at 73 n. 6 (emphasis added). In footnote seven, the Court considered"cases involving contempt orders for failure to pay alimony" and found that these also turned on the same ability-to-comply principle. Id. at 74 n. 7.

> possession is given credit after demonstration that a period in prison does not produce the goods. The fact that he has been under the shadow of prison gates may be enough, coupled with his denial and the type of evidence mentioned above, to convince the court that his is not a wilful disobedience which will yield to coercion.
>
> The trial court is obliged to weigh not merely the two

facts, that a turnover order has issued and that it has not been obeyed, but all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break.

333 U.S. at 76 (emphasis added).

Mr. Chadwick's reading of Maggio is based principally on the two highlighted sentences in the block quote above. See Pet. for Rehearing at 5. Mr. Chadwick interprets these sentences to mean that "[t]he law eventually ceases trying in the civil context to distinguish inability to comply with adamant refusal." Pet. for Rehearing at 5. This reading, however, takes these two sentences out of context. When the statements are read in context, it is apparent that they refer to the inference of an inability to pay that arises after long confinement.

This interpretation is strongly supported by the Maggio Court's discussion of Oriel, to which we have previously referred. The first of the two sentences in Maggio on which Mr. Chadwick relies begins with the words "It is every where admitted . . . ." The sentence is thus restating settled law, not forging new ground, and the settled law is that recounted in Oriel, i.e., that a contempt order should not be issued unless there is a present inability to comply. See 333 U.S. at 72-74 and nn. 6, 7.

That the sentences in Maggio on which Mr. Chadwick relies refer to the inability to comply is also strongly supported by other parts of the opinion to which we have already referred. One example is the Court's statement that a person in Maggio's position could meet the prima facie case of continued possession "only" by showing a present

22

inability to comply. 333 U.S. at 75. Another example is supplied by the very next sentence after those on which the petition relies. That sentence states that long confinement ("the shadow of prison gates"), together with a denial of possession and corroborating evidence "may be enough" to convince a court that the contemnor is not being "willfully disobedient" but simply cannot comply. Id. at 76 (emphasis added).

When the two sentences from Maggio on which Mr. Chadwick relies are read in context, it is apparent that they refer to the inference that may be drawn under most circumstances when a contemnor, despite long confinement, fails to comply with an order such as a bankruptcy turnover order.13 After all, the vast majority of people would not remain in jail "forever" rather than obey a court order requiring that the property of a bankrupt estate be turned over. Thus, in most cases, after a certain period, the inference that the contemnor is unable to comply becomes overwhelming. The present case, however,

is not the ordinary case. On the contrary, it concerns an individual whom we must assume is fully capable of complying with the state court order but simply will not do so. Neither Maggio nor any other Supreme Court case clearly establishes that such a person must be released.

_____

13. We note that the Third Circuit opinion on which Mr. Chadwick relies most heavily -- In re Grand Jury Investigation (Appeal of Braun), 600 F.2d 420 (3d Cir. 1979)("Braun") -- interpreted Maggio in this way. In Braun, a panel of our court accepted the very proposition of law advanced by Mr. Chadwick and accepted by the District Court -- that a civil contemnor who is simply unwilling to comply with the court order must be released after the passage of a certain period of time -- but the panel did not suggest that Maggio required or even supported this holding. Instead, the Braun court wrote:

> Since it is impossible to succeed in coercing that which is beyond a person's power to perform, continued incarceration for civil contempt "depends upon the ability of the contemnor to comply with the court's order. Maggio v. Zeitz, 333 U.S. 56, 76, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948)."

600 F.2d at 423 (quoting Shillitani v. United States, 384 U.S. 364, 371 (1966)). This understanding of Maggio, which contrasts sharply with Mr. Chadwick's, is correct.

23

2.

In this case, the District Court properly proceeded on the assumption that Mr. Chadwick has the present ability to comply with the July 1994 state court order. The state courts have repeatedly so found. Under 28 U.S.C. S 2254(e)(1), the District Court was bound by these state court factual determinations, absent rebuttal of the presumption of correctness by clear and convincing evidence. The District Court acknowledged that the record demonstrates that the state court findings were not erroneous, and the District Court stated that it was "convinced that [Mr.] Chadwick has the present ability to comply with the July 22, 1994 order." Chadwick v. Janecka, No. 00-1130, 2002 U.S. Dist. LEXIS 10, at *19 (E.D.Pa. Jan. 3, 2002).

Presuming these state court factual findings to be correct, the District Court nevertheless concluded that Mr. Chadwick's confinement had become punitive and that therefore the state court decision was an unreasonable application of federal law. Although the District Court alluded to the Supreme Court's decisions in Bagwell and Gompers, the District Court relied chiefly on this Court's decision in In re Grand Jury Investigation (Appeal of Braun), 600 F.2d 420 (3d Cir. 1979)("Braun"), in concluding that the passage of time may alter the nature of a contemnor's confinement, transforming it from coercive to punitive and requiring observance of the procedural rights associated with criminal contempt. With this principle in mind, the

District Court concluded that because Mr. Chadwick had defied the court's order for so long, there was "no substantial likelihood" that he would comply in the future and that therefore the order had lost its coercive effect.

In Braun, we upheld a contemnor's confinement for refusing to testify before a federal grand jury. Id. at 428. The contemnor argued that his confinement was not coercive but punitive, because "there was no substantial likelihood that he would testify before the grand jury." Id. at 422. Recognizing that some courts had applied the "no substantial likelihood of compliance" standard, we noted that the contemnor had been confined under a federal statute that limited confinement to 18 months for refusing

24

to testify before a grand jury. Id. at 423-24. We held that, absent unusual circumstances, 18 months was not an unreasonable length for confinement in this context, and declined to inquire whether, in fact, there was no substantial likelihood that the contemnor would comply with the order to testify. Id. at 427.

Under 28 U.S.C. S 2254(d), the District Court's holding -- that Mr. Chadwick can no longer be held in custody for civil contempt because there is "no substantial likelihood" that he will comply with the order -- is erroneous. The District Court incorrectly relied on dicta in one of our opinions, but AEDPA is clear that the appropriate law to apply is Supreme Court precedent. See 28 U.S.C. S 2254(d)(1) (referring to "clearly established Federal law, as determined by the Supreme Court of the United States"); see also Williams, 529 U.S. at 412 ("S 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence").

It is true that "federal habeas courts are [not] precluded from considering the decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable." Matteo, 171 F.3d at 890. But this Court has clearly stated that decisions by lower federal courts may be considered only "as helpful amplifications of Supreme Court precedent." Id. It is revealing to us that in Braun this Court characterized the "no substantial likelihood" test as an "additional constraint upon the civil contempt power" beyond that recognized in decisions by the United States Supreme Court. Braun, 600 F.2d at 423 (emphasis added). As we noted in Matteo, 171 F.3d at 890, however, "federal courts may not grant habeas corpus relief based on the state court's failure to adhere to the precedent of a lower federal court on an issue that the Supreme Court has not addressed."

The Supreme Court has never endorsed the proposition that confinement for civil contempt must cease when there is "no substantial likelihood of compliance." On the contrary, in words that might as well have been written to describe the case now before us, the Bagwell Court stated

that "[t]he paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he

complies with an affirmative command such as an order 'to pay alimony, or to surrender property ordered to be turned over to a receiver . . . .' " Bagwell, 512 U.S. at 828 (emphasis added) (citation omitted). We have no need here to decide whether In re Grand Jury Investigation remains good law in light of Bagwell. It is enough for present purposes that the state court decisions cannot be disturbed under the restricted standard of review applicable in this habeas case.

V.

Because the state courts have repeatedly found that Mr. Chadwick has the present ability to comply with the July 1994 state court order, we cannot disturb the state courts' decision that there is no federal constitutional bar to Mr. Chadwick's indefinite confinement for civil contempt so long as he retains the ability to comply with the order requiring him to pay over the money at issue. Accordingly, the District Court erred in holding that the state courts' decisions were an unreasonable application of Supreme Court precedent. We, therefore, reverse the order of the District Court granting Mr. Chadwick's petition.

Our decision does not preclude Mr. Chadwick from filing a new federal habeas petition if he claims that he is unable for some reason to comply with the state court's order. And, needless to say, our decision imposes no restrictions on the state courts' ability to grant relief.14

A True Copy:
Teste:

      Clerk of the UnitedStates Court of Appeals
      for the Third Circuit

---

14. We do not agree with Mr. Chadwick's argument that despite our reversal of the District Court's order, the respondents in the District Court must still release Mr. Chadwick because they did not appeal. Because of our judgment, the District Court's order granting the writ no longer has any operative effect and thus cannot command his release.